BEACON BOWL, INC., a domestic corporation, Allen Krzykowski and Barbara Krzykowski, Plaintiffs,

WEST BEND MUTUAL INSURANCE COMPANY, a domestic corporation and Tower Insurance Company, Inc., a domestic corporation, Plaintiffs-Respondents-Cross Respondents-Cross Appellants,

v.

WISCONSIN ELECTRIC POWER COMPANY, a domestic corporation, Defendant-Appellant-Cross Respondent,

PINKY ELECTRIC INCORPORATED, a domestic corporation, Defendant-Third Party Plaintiff-Respondent-Cross Appellant-Cross Respondent,

v.

CITY OF NEW BERLIN and Donald Steinbach, Third Party Defendants.

Supreme Court

*No. 91–0862. Oral argument February 1, 1993.—Decided June 9, 1993.*

(Also reported in 501 N.W.2d 788.)

741

742

745

746

750

751

752

For the defendant-appellant-cross respondent there were briefs (in the court of appeals & supreme court) by *John E. Feldbruegge, Gerald R. Harmon, Dorothy H. Dey* and *Quale, Feldbruegge, Calvelli, Thom & Croke,* Madison and oral argument by *John E. Feldbruegge.*

For the defendant-third party plaintiff-respondent-cross appellant-cross respondent there were briefs by *Robert D. Scott, Erika T. Flierl* and *Frisch Dudek, Ltd.,* Milwaukee and oral argument by *Robert D. Scott.*

For the plaintiffs-respondents-cross respondents-cross appellants there were briefs by *Terry J. Booth* and *Fellows, Piper & Schmidt,* Milwaukee and oral argument by *Terry J. Booth.*

Amicus Curiae brief was filed by *Griffin G. Dorschel* and *Axley Brynelson,* Madison for Wisconsin Utilities Association, Inc.

LOUIS J. CECI, J. This case comes before the court on certification by the court of appeals, District II, pursuant to sec. (Rule) 809.61, Stats.

754

In 1985, a fire extensively damaged the Beacon Bowl restaurant, bar, and bowling alley. West Bend Mutual Insurance Company and Tower Insurance Company, Inc. (insurers) paid their insureds for damages caused by the fire and, as subrogated plaintiffs, sued Wisconsin Electric Power Company (WEPCO) and Pinky Electric Incorporated (Pinky) for property damage caused by the fire. A jury found WEPCO 85 percent negligent, Pinky 10 percent negligent, and the City of New Berlin 5 percent negligent. WEPCO appealed, and both Pinky and the insurers cross-appealed. The court of appeals certified the following issues to this court:

(1) In this tort action against a public utility, does *Ransome v. Wisconsin Elec. Power Co.*, 87 Wis. 2d 605, 275 N.W.2d 641 (1979), apply and, if so, what are the limits, if any, of *Ransome* regarding foreseeability of harm?

(2) May an industry code violation be the basis for recovery against a public utility without a concomitant finding of negligence?

(3) Is a subrogated insurer entitled to treble damages pursuant to sec. [196.64], Stats.?

(4) Should the law of preverdict interest be revisited in light of past supreme court comment?

(5) Does *Ehlinger v. Sipes,* 155 Wis. 2d 1, 454 N.W.2d 754 (1990), apply outside the medical malpractice field?

This court accepted certification. We conclude that: (1) *Ransome* does not preclude courts from deciding on a case-by-case basis to deny recovery on the basis of public policy considerations; (2) the violation of an industry code section, National Electrical Safety

Code (NESC) 281, which the Wisconsin Administrative Code adopts by reference, can be the basis of recovery against a public utility without a concomitant finding of negligence; (3) the subrogated insurers in this case are not entitled to treble damages; (4) the subject of preverdict interest is better left to the legislature; and (5) *Ehlinger* does not apply outside of medical omission and medical misdiagnosis cases. After discussing the certified issues, we address the other issues raised.

At 2:42 p.m. on May 19, 1985, a power outage occurred on WEPCO feeder X22262. A feeder is a high-voltage primary electrical line; it feeds a large area, larger than a particular building or block. The outage affected the Beacon Bowl, a restaurant, bar, bowling alley, and private residence owned by Allen and Barbara Krzykowski. Feeder X22262 served Beacon Bowl and West National Avenue in New Berlin. The outage lasted only several seconds. Around that time, the lights inside Beacon Bowl flickered on and off, and Mrs. Krzykowski noticed smoke pouring out of two automatic ball returns in the bowling alley.

Karen Kotar, a Beacon Bowl employee, and Mark Krzykowski, the Krzykowskis' son, went into the basement and discovered the main electrical distribution panel making a hissing sound and emitting flames and sparks. Mark went to get a fire extinguisher and handed it to another person who was present, but that person could not get close enough to the fire because of the smoke and sparks. Hot molten particles fell from the main distribution panel onto nearby combustibles, and the Beacon Bowl caught fire.

Witnesses testified that at approximately the same time that the outage occurred, they heard an explosion and saw a blue puff of smoke near WEPCO line X22262; that lights had just flickered; that they

observed a flash of light coming from the electrical wires; and that arcing was also observed.

A WEPCO "troubleshooter" arrived at Beacon Bowl at approximately 3:48 p.m. and found that feeder X22262 had "locked out" and that trees had grown into and above the lines near Warehouse Shoes, across the street from Beacon Bowl. He also observed that the three lines that made up the primary line were pitted and discolored and that the pit marks and discoloration were caused by electricity arcing. A WEPCO lineman and a WEPCO tree trimmer also examined the lines after the fire and saw evidence of trees touching the lines and of arcing occurring between the trees and lines.

In 1978, Pinky had installed a 400 amp electrical service in the Beacon Bowl, supplying all the hardware for the interior work, including two electrical panels. Electricity entered Beacon Bowl through an exterior meter, went through a wall and into the main disconnect electrical panel, a main switch with two fuses which controlled the flow of electricity from the source.

Three conductors went from the main disconnect to the main distribution panel by way of a PVC pipe. Pinky admitted that the PVC it used was a nonconductor and that it failed to provide a proper ground between the main disconnect and the main distribution panels. The main distribution panel broke up electricity into smaller circuits which had circuit breakers.

Beacon Bowl had experienced problems with its electricity in 1982. At that time, a WEPCO tree trimmer discovered that trees had contacted the wires across the street, causing several short power outages and one "lock-out." One of the electrical lines had burned completely down because of the tree contact.

The Krzykowskis and the insurers filed a complaint, alleging that WEPCO and Pinky were responsible for the fire. WEPCO filed a cross-complaint against Pinky. Pinky filed a cross-complaint against WEPCO. Pinky also filed a third-party complaint against the City of New Berlin and its electrical inspector, Donald Steinbach. Pinky conceded it had been negligent in failing to properly ground the connection between the main disconnect and the main distribution panels. However, Pinky denied that its negligence caused plaintiffs' damages.

The Krzykowskis eventually settled their claims against the defendants. That release did not include the insurers' subrogated interests.

At trial, the insurers contended that on the day of the fire, trees contacted feeder X22262 near the Warehouse Shoes store, that the contact caused a succession of high-voltage transients to be transmitted into Beacon Bowl, and that these transients damaged insulation on a wire inside the main distribution box, resulting in arcing and the ensuing fire. The insurers and Pinky contended that WEPCO negligently failed to inspect and trim trees near feeder X22262; that the electricity was defective and unreasonably dangerous; and that WEPCO violated sec. 196.74, Stats., Wis. Admin. Code sec. PSC 114.04, and NESC 281 and 214. The insurers claimed treble damages under sec. 196.64, Stats., against WEPCO. The insurers additionally contended that Pinky's admitted negligence was a cause of the fire. WEPCO contended that Pinky's negligence caused the fire.

Each party called expert witnesses to testify about causation. Dr. Szews testified for the insurers. Dr. Szews said that both high-voltage spikes from WEPCO lines and the lack of proper grounding on the main

distribution panel were "substantial factors" or "causes" of the fire. Dr. Szews explained that when trees contacted the primary lines, arcing faults occurred. The arcing faults caused a succession of high-voltage "transients" or "spikes" to travel along the line and through the transformers, and those spikes finally damaged insulation in the circuit breaker box. Arcing occurred at the point where the insulation was damaged, and that arcing melted the circuit breaker box and gave off high-voltage spikes and molten particles. The sparking and molten particles ignited nearby combustibles.

Dr. Szews also testified that the lack of proper grounding delayed the operation of a fuse.

Mr. Snedeker, WEPCO's expert, testified that voltage transients did not cause the fire. Instead, Snedeker testified that a loose connection in the sixth circuit breaker and an overcurrent caused arcing at the sixth circuit breaker, and this was followed by arcing at the bottom of the main distribution panel. Snedeker also said there was a connection between the fire and the lack of proper grounding.

Dr. Bernstein, Pinky's expert, corroborated Dr. Szews' testimony. According to Bernstein, trees contacting WEPCO's lines produced arcing faults which in turn produced transients. These transients caused "overvoltage spikes" which caused arcing in the distribution panel and eventually ignited nearby combustibles.

During the trial, Pinky settled with the City of New Berlin and Steinbach. Pinky agreed to release the city and indemnify it in the event that a judgment was obtained against the city.

At the close of the insurers' case, WEPCO and Pinky moved to dismiss. *See sec.* 805.14(3), Stats. The

court denied WEPCO's motion, but deferred ruling on Pinky's motion.

The jury returned its verdict, finding that WEPCO did not violate PSC 114.04, but that it did violate NESC 214 and 281, and such violations were causal. The jury also found WEPCO negligent with respect to inspecting and trimming trees and that such negligence was also causal. The jury further found that the electricity supplied by WEPCO was defective and unreasonably dangerous when it entered Beacon Bowl and that such electricity was a cause of the fire.

With regard to Pinky, the jury found that Pinky's admitted negligence was a cause of the fire.

The jury found that the City of New Berlin was negligent in its inspection and that its negligence was causal.

The jury attributed the causal negligence of the parties as follows: WEPCO 85 percent, Pinky 10 percent, and the City of New Berlin 5 percent.

The jury determined that before the fire the fair market value of Beacon Bowl was $427,449 and the fair market value of a book collection was $160.

The court denied WEPCO's and Pinky's motions after verdict and entered judgment. Judgment was entered in favor of the insurers and against WEPCO and Pinky, jointly and severally, for the full amount of the verdict. WEPCO had contribution rights against Pinky for 15 percent of the judgment, and Pinky had contribution rights against WEPCO for 85 percent of the judgment. The court further held that WEPCO was liable under sec. 196.64, Stats., for three times its 85 percent portion of the verdict. The judgment included postverdict, but not preverdict, interest.

# I.

## PUBLIC POLICY CONSIDERATIONS AND *RANSOME*

WEPCO contends that the circuit court erred by failing to dismiss the insurers' complaint and Pinky's cross-complaint as a matter of public policy. We disagree. (WEPCO accepts the jury's findings of negligence and cause for the purposes of this argument only.) Even though a jury has found negligence and that such negligence was a "cause" (or substantial factor) in producing a plaintiff's damages, liability may be denied under factors that we have termed public policy considerations. Such factors include:

> (1) The injury is too remote from the negligence; or (2) the injury is too wholly out of proportion to the culpability of the negligent tort-feasor; or (3) in retrospect it appears too highly extraordinary that the negligence should have brought about the harm; or (4) because allowance of recovery would place too unreasonable a burden on the negligent tort-feasor; or (5) because allowance of recovery would be too likely to open the way for fraudulent claims; or (6) allowance of recovery would enter a field that has no sensible or just stopping point.

*Coffey v. Milwaukee,* 74 Wis. 2d 526, 541, 247 N.W.2d 132 (1976) (citations omitted). The question of whether to deny recovery because of public policy considerations is a question of law. *See Widell v. Tollefson,* 158 Wis. 2d 674, 682, 462 N.W.2d 910 (Ct. App. 1990). WEPCO argues that each of the factors discussed in *Coffey* compels dismissal. We disagree.

761

■

The injury is not too remote from the negligence. The word "remote" as it is used in *Coffey* and like cases means removed or separated from the negligence in time, place, or sequence of events. *See, e.g., Colla v. Mandella,* 1 Wis. 2d 594, 599, 85 N.W.2d 345 (1957); *Toeller v. Mutual Serv. Casualty Ins. Co.,* 115 Wis. 2d 631, 638–39, 340 N.W.2d 923 (Ct. App. 1983). In this case, the fire occurred minutes after trees contacted WEPCO lines across the street from Beacon Bowl, and the chain of causation was direct and unbroken.

WEPCO argues that the injury is too remote because its experts had no knowledge of voltage transients starting fires inside buildings. This argument may have relevance to another public policy consideration, but it has little, if any, relevance to whether or not the negligence is remote.

We also disagree with WEPCO's contention that the injury is too wholly out of proportion to its culpability. WEPCO trimmed the trees near feeder X22262 in 1982. According to WEPCO, the trees that touched WEPCO lines in 1985 consisted of minimal new growth. Its argument is that the damage caused by the fire is too wholly out of proportion to WEPCO's culpability—failing to trim trees soon enough.

We disagree. WEPCO knew that tree contact with WEPCO lines had previously caused flickering lights at Beacon Bowl, triggered electrical outages, and burned electrical wires.

■

Culpability in negligence jurisprudence is tied to foreseeability, and WEPCO contends that this occurrence was not foreseeable. It is a given that serious harm can result from simple everyday negligence. This case involves a utility's negligence with electricity. The

damage that negligence caused to Beacon Bowl is not out of proportion to the culpability inherent in negligent conduct related to electricity.

WEPCO's strongest public policy argument is that it is too highly extraordinary that its negligence should have brought about the harm. Indeed, the circuit court appeared persuaded by WEPCO's argument. The circuit court thought the result, a fire caused by transients, was unprecedented. Thus, the circuit court concluded that the fire was an extraordinary result. Nevertheless, the circuit court concluded that our discussion of public policy in *Ransome* precluded it from cutting off WEPCO's liability. WEPCO appealed, and the court of appeals certified the issue of whether *Ransome* "applies" in this tort action and, if so, what "are the limits, if any, of *Ransome* regarding foreseeability of harm?"

*Ransome* has relevance to this action although it does not "apply" to this action. Liability is determined on a case-by-case basis in negligence and strict liability cases, depending on the facts.

The *Coffey* court discussed the public policy factors a court considers when determining proximate cause. *Coffey,* 74 Wis. 2d at 541; *Sanem v. Home Ins. Co.,* 119 Wis. 2d 530, 538–39, 350 N.W.2d 89 (1984). The *Ransome* court discussed public policy as well. *Ransome,* 87 Wis. 2d at 618–19, 625. However, the court's discussion in *Ransome* focused primarily on the considerations which weighed in favor of imposing the doctrine of strict liability to electricity and only secondarily on whether to deny liability in that particular case. The *Ransome* court's discussion of public policy does not preclude circuit courts from considering public policy factors which weigh in favor of denying liability.

Having said that, we consider WEPCO's contention that this was an unprecedented or extraordinary result. We are not persuaded. Dr. Szews testified that he knew of a similar type of event which occurred in Oshkosh, and he had read of others. Moreover, as discussed before, WEPCO had experienced problems with trees in its lines in 1982 which had burned down its lines and the tops of trees. While it may not be common that negligence with electricity will cause a fire like the one that occurred at Beacon Bowl, neither is it so highly extraordinary that we are compelled to deny recovery for WEPCO's negligence.

WEPCO next argues that allowing recovery would place too unreasonable a burden on it because imposing liability will require it to prevent all future voltage transients—a feat WEPCO says is impossible. WEPCO says that at a minimum it will have to "trim all trees away from all of its lines under all circumstances and at all times in order to prevent imposition of liability."

In support of this argument, WEPCO cites *Walker v. Bignell,* 100 Wis. 2d 256, 263, 301 N.W.2d 447 (1981), and *Sanem,* 119 Wis. 2d at 540. We reject WEPCO's argument for two reasons. One, *Walker* and *Sanem* dealt with municipal liability and county liability which raise different policy concerns than this case. Second, and more importantly, holding WEPCO liable will neither increase WEPCO's common-law duty nor subject it to an unreasonable burden. WEPCO has a duty to exercise reasonable care. *Walker,* 100 Wis. 2d at 263. Depending on the circumstances, reasonable care may, or it may not, require WEPCO to trim all trees.

Additionally, as discussed more fully later in this opinion, WEPCO is also under a statutory duty to trim trees. NESC 281 provides:

**281. Tree Trimming**

A. General

 1. Trees which may interfere with ungrounded supply conductors should be trimmed or removed. *NOTE:* Normal tree growth, the combined movement of trees and conductors under adverse weather conditions, voltage, and sagging of conductors at elevated temperatures are among the factors to be considered in determining the extent of trimming required.

 2. Where trimming or removal is not practical, the conductor should be separated from the tree with suitable materials or devices to avoid conductor damage by abrasion and grounding of the circuit through the tree.

B. At Line Crossings, Railroad Crossings, and Limited Access Highway Crossings

 The crossing span and the adjoining span on each side of the crossing should be kept free from overhanging or decayed trees or limbs which otherwise might fall into the line.

Imposing liability in this case will not enlarge the duty WEPCO is under to any meaningful degree. Given the dangerous characteristics of electricity, imposing liability will not make WEPCO's burden unreasonable.

We also disagree with WEPCO's assertion that imposing liability will open the way for fraudulent claims because the "sole basis for the conclusion that the voltage transient caused the fire was the testimony of experts." Many tort cases depend solely on expert testimony for evidence of cause, and in this case quali-

fied experts testified in support of the insurers' and Pinky's theories. Although WEPCO's expert testified to the contrary, the jury apparently believed Pinky's and the insurers' experts. Imposing liability in this case will not relieve future plaintiffs of the burden of proving cause. This was not an unexplained fire. WEPCO simply disagrees with the explanation the jury evidently believed.

## II.

## THE SPECIAL VERDICT AND EVIDENTIARY MATTERS

As part of what can only be described as a shotgun approach that comes perilously close to being frivolous at times, WEPCO makes numerous claims that the circuit court made discretionary errors. A court properly exercises its discretion when it examines the relevant facts, applies a proper legal standard, and reaches a reasonable conclusion. *See Loy v. Bunderson,* 107 Wis. 2d 400, 414–15, 320 N.W.2d 175 (1982). We have examined the extensive record in this case and have determined that the circuit court properly exercised its discretion.

### A. Special Verdict

WEPCO argues that the circuit court erroneously submitted questions to the jury which asked whether it had violated PSC 114.04, NESC 214, and NESC 281 without also instructing the jury that it had to find WEPCO negligent before it could find that WEPCO had violated those provisions. WEPCO claims the circuit court reached this conclusion based on this court's decision in *Peissig v. Wisconsin Gas Co.,* 155 Wis. 2d

686, 456 N.W.2d 348 (1990). We have examined the portion of the record WEPCO cites to and find no mention of *Peissig.* Instead, the circuit court submitted the separate questions regarding PSC 114.04, NESC 214, and NESC 281 because the circuit court believed they were separate standards of conduct and that a violation of any one of them would be a basis for imposing liability without a concomitant finding of common-law negligence. We agree with the circuit court.

The court of appeals certified this issue, noting that

> Wisconsin law recognizes that statutory or administrative code violations can constitute negligence. *See Fortier v. Flambeau Plastics Co.,* 164 Wis. 2d 639, 657–58, 476 N.W.2d 593, 600–01 (Ct. App. 1991). In addition, the law also recognizes industry custom and usage as bearing upon the question of a party's negligence. However, we are not directed to any law which speaks to whether an *industry code violation,* standing alone, can serve as the basis for liability.

(Emphasis in original; footnote omitted.) NESC 214 and NESC 281 are not industry code violations standing alone. Wisconsin Admin. Code sec. PSC 114.06 adopts the National Electrical Safety Code by reference. NESC 214 and NESC 281 are thus part of the Wisconsin Administrative Code. NESC 214, NESC 281, and PSC 114.04 are safety statutes, the violation of which is negligence *per se.* The circuit court properly submitted questions about these code sections without instructing the jury that they also had to make a finding of negligence.

767

■
WEPCO also claims that the special verdict questions which addressed statutory and code violations, negligence, and strict liability prejudicially focused undue attention on WEPCO's conduct. We disagree. At the close of testimony, there were issues of fact regarding WEPCO's liability for statutory and code violations, common-law negligence, and strict liability. The questions were thus proper. *See Dahl v. K-Mart,* 46 Wis. 2d 605, 609, 176 N.W.2d 342 (1970).

WEPCO maintains that the verdict the jury returned is inconsistent because the jury answered that WEPCO did not violate PSC 114.04(1) but that WEPCO did violate NESC 281. PSC 114.04(1) states: "All electrical power and communication equipment and lines shall be of such construction, and so installed, operated and maintained as to minimize the life and fire hazard." NESC 281 states, in part, "[t]rees which may interfere with ungrounded supply conductors should be trimmed or removed." NESC 281.A.1. WEPCO contends that PSC 114.04 is mandatory and general and that NESC 281 is advisory and specific and, consequently, the jury acted inconsistently by finding that WEPCO did not violate PSC 114.04 but that it did violate NESC 281.

■
Again we disagree. PSC 114.04 deals with maintenance and operation of electrical power equipment and lines, while NESC 281 deals with the trimming and removal of trees. The jury could have consistently concluded that WEPCO operated and maintained its equipment and lines in accordance with PSC 114.04 but did not trim trees in accordance with NESC 281.

We are also unpersuaded by WEPCO's argument that NESC 281 is advisory and hence cannot be vio-

lated. Although the section uses the word "should," NESC 015 states that "[w]here a rule is of an advisory nature, <u>to be followed insofar as practical,</u> it is indicated by the use of the word *should.*" (Emphasis added.) Depending on the practicality of trimming, NESC 281 can be violated.

WEPCO's next attack is to claim that NESC 281 was not intended to protect Beacon Bowl. In *Schicker v. Leick,* we said:

> [I]f a person violating the safety statute was in a class of persons that the safety statute sought to regulate, that person should be held to have a duty to the class of persons or the type of property which the safety statute seeks to protect.

40 Wis. 2d 295, 301, 162 N.W.2d 66 (1968). WEPCO argues that NESC 281 does not seek to protect Beacon Bowl because its drafters did not contemplate that it would prevent fires resulting from voltage transients. It follows, WEPCO claims, that NESC 281 is not a safety statute, the violation of which is negligence *per se. See Schicker,* 40 Wis. 2d at 301. Accordingly, WEPCO maintains that the circuit court erred by submitting a question about NESC 281. We disagree with this argument because common sense suggests that NESC 281 was meant to protect members of the public (such as the Krzykowskis) who use electricity on lines that may have trees nearby that should be trimmed or removed. We therefore conclude that the circuit court did not err by submitting a question concerning NESC 281 to the jury.

WEPCO also claims the circuit court erred by submitting the negligence question. It did not. A party may

be negligent even if it complies with all applicable statutory and code sections. *Kemp v. Wisconsin Electric Power Co.,* 44 Wis. 2d 571, 579, 172 N.W.2d 161 (1969).

WEPCO claims it had no common-law duty to trim trees in order to prevent voltage transients. However,

> within the framework of a negligence case the particular conduct of a defendant is not examined in terms of whether or not there is a duty to do a specific act, but rather whether the conduct satisfied the duty placed upon individuals to exercise that degree of care as would be exercised by a reasonable person under the circumstances.

*Walker,* 100 Wis. 2d at 264. Evidence introduced at trial created a factual issue as to whether WEPCO had exercised reasonable care. Accordingly, the circuit court properly submitted the negligence question to the jury.

### B. Evidentiary Rulings

WEPCO next assaults three of the circuit court's evidentiary rulings, the first concerning the testimony of Dr. Szews. Evidentiary rulings are discretionary rulings. *See generally State v. Pittman,* 174 Wis. 2d 255, 267, 496 N.W.2d 74 (1993).

WEPCO claims Dr. Szews was not qualified to give expert testimony. We have examined the portion of the record that WEPCO cites and have examined the circuit court's discussion of this issue. WEPCO's argument is groundless. Dr. Szews' education, background, and experience qualified him. *See* sec. 907.02, Stats.

■

Next, WEPCO asserts that the circuit court erred by refusing to allow Mr. Hooper, a retired employee of the Public Service Electric and Gas Company and a part-time consultant, to testify. WEPCO claims Hooper's testimony would have reflected the knowledge of the utility industry in general. Hooper was a member of an NESC subcommittee. The circuit court properly precluded Hooper from testifying about the intent of the drafters of NESC 281. *See, e.g., Labor & Farm Party v. Elections Board,* 117 Wis. 2d 351, 356, 344 N.W.2d 177 (1984) (improper for court to rely on legislators' statements concerning legislative intent); *Cartwright v. Sharpe,* 40 Wis. 2d 494, 508–09, 162 N.W.2d 5 (1968) (improper to allow member of legislature to testify about legislative intent applied to facts of case).

■

WEPCO argues that the court erred by precluding Hooper from testifying about his knowledge and the industry's knowledge in general because, under *D.L. v. Huebner,* 110 Wis. 2d 581, 622–23, 329 N.W.2d 890 (1983), such negative evidence was admissible to show that WEPCO's product was safe. The circuit court properly exercised its discretion regarding Hooper's lack of knowledge. Such testimony would have had little probative value and would have raised collateral issues. This argument is related to WEPCO's next claim of circuit court error.

■

WEPCO claims the court erred by precluding three WEPCO employees from testifying about their personal knowledge of voltage transients and fires in buildings. The circuit court correctly concluded that allowing the three WEPCO employees to testify would

771

raise collateral issues. Pinky had asked WEPCO in interrogatories to identify all persons who had sustained damage from voltage spikes. WEPCO refused to provide that information because, among other reasons, it claimed the information was irrelevant. The court offered to let the WEPCO employees testify about the lack of other fires caused by voltage spikes resulting from tree contact if WEPCO gave Pinky and the insurers records of claims and incidents. WEPCO did not give them the records. The court's rulings were correct, based on the proper legal standard, *see* sec. 904.03, Stats., and facts of record.

WEPCO also contends that the circuit court erred by preventing it from presenting an argument in rebuttal of Pinky. The decision of whether to allow one defendant to rebut another defendant's closing argument is a discretionary decision. *Wells v. National Indemnity Co.,* 41 Wis. 2d 1, 7–8, 162 N.W.2d 562 (1968).

WEPCO's reliance on *Wells,* a case in which we interpreted sec. 270.205, Stats., the predecessor to sec. 805.10, Stats., is misplaced. We believe WEPCO misconstrues our language in *Wells* and appears to argue that prejudice to the plaintiff is the *only* proper consideration when deciding whether to allow a defendant to rebut another defendant. Here, the court considered all factors and made a reasonable decision that the complaints WEPCO had would be better addressed by further instructions to the jury.

## III.

## TREBLE DAMAGES

██ WEPCO contends that the circuit court erred by awarding the insurers treble damages under sec. 196.64, Stats. 1989–90. This contention presents a question of law which we decide without deference to the circuit court. Section 196.64, 1989–90, provides:

> **196.64 Public utilities, liability for treble damages.** If a public utility does, causes or permits to be done any matter, act or thing prohibited or declared to be unlawful under this chapter or ch. 197, or fails to do any act, matter or thing required to be done by it, the public utility shall be liable to the person injured thereby in treble the amount of damages sustained in consequence of the violation.

The jury determined that WEPCO caused damages by failing to do acts, matters, or things it was required to do. WEPCO asserts that as a matter of law the subrogated insurers may not recover treble damages. We agree, because (1) subrogation law prevents a subrogee from recovering more than it paid to the subrogor, and (2) the subrogation receipts the Krzykowskis signed limited the subrogated amount to the extent paid.

"Subrogation gives indemnity only. One with a cause of action for subrogation cannot recover beyond the amount actually disbursed." *D'Angelo v. Cornell Paperboard Products Co.,* 19 Wis. 2d 390, 402, 120 N.W.2d 70 (1963) (footnote omitted). *See also Mutual Service v. American Family,* 140 Wis. 2d 555, 562, 410 N.W.2d 582 (1987); *Blue Cross v. Fireman's Fund,* 140 Wis. 2d 544, 547, 411 N.W.2d 133 (1987); *Wilmot v. Racine County,* 136 Wis. 2d 57, 63, 400 N.W.2d 917

(1987). Thus, the insurers are entitled to recover the amount they paid the Krzykowskis, but no more.

Moreover, the subrogation receipts which the insurers received in exchange for their payments to the Krzykowskis limit the insurers' subrogation rights. The receipts state, "In consideration of and *to the extent* of said payment the undersigned hereby subrogates said Insurance Company to all of the rights, claims, and interest which the undersigned may have against any person . . . ." (Emphasis added.) The subrogation receipts expressly limit the amount the insurers can recover to the amount they paid. Treble damages exceed that amount. We hold that the insurers may not recover treble damages from WEPCO.

WEPCO also asks us to overrule *Peissig,* which held that a finding of wilful, wanton, or reckless conduct was not a prerequisite to awarding treble damages under sec. 196.64, Stats. *Peissig,* 155 Wis. 2d at 696–97. Before *Peissig,* a finding of such conduct was necessary. *See id.* at 693–94.

The fire burned Beacon Bowl down in 1985. We decided *Peissig* in June, 1990. The trial was held in the fall of 1990. Shortly after we decided *Peissig,* the legislature changed sec. 196.64, Stats., so that it now explicitly requires wanton, wilful, or reckless conduct. *See* 1991 Wis. Act 39, sec. 2982bs. WEPCO, along with *amicus* Wisconsin Utilities Association, ask us to overrule *Peissig* because, they claim, *Peissig* is contrary to legislative intent and because the new statute should be applied retroactively. We need not address the retroactivity issue because long-standing principles of subrogation law and the language of the subrogation receipts compel us to conclude that the insurers cannot recover treble damages.

774

The insurers make several arguments to persuade us to the contrary. We find none of their arguments persuasive. The first is based on the policy behind sec. 196.64—punishment. We conclude that the equitable principles of subrogation take precedence over the policy of sec. 196.64, Stats. To conclude otherwise would mean unjustly enriching the subrogated insurers.

The insurers' next argument is based on the premise that when the insurers paid the Krzykowskis, a portion of the cause of action formerly owned by the Krzykowskis was assigned to the insurers. In *Wilmot,* one of the cases the insurers cite, we said:

> We have previously held that under subrogation a subrogee succeeds to the legal rights or claims of another (subrogor) . . . . Thus a subrogee is one who steps into the shoes of the subrogor *to the extent it has made payment* as a result of the actionable event.

136 Wis. 2d at 63 (emphasis added; citations omitted). The subrogee certainly does stand in the shoes of the subrogor, but only to the extent it has made payments.

The insurers next assert that if insurers can be held responsible for paying multiple damages, *see Cieslewicz v. Mutual Service Cas. Ins. Co.,* 84 Wis. 2d 91, 267 N.W.2d 595 (1978), they should be able to recover multiple damages as subrogees. For insurers to receive multiple damages could be inequitable if, as here, the insurers had been paid a premium, had paid their insureds under a policy, and had successfully recovered as subrogated plaintiffs. In this situation, we would unjustly enrich the insurance companies were we to award them multiple damages.

The insurers argue that public policy supports their interpretation of sec. 196.64, Stats. The insurers claim that their interpretation will prevent utilities from avoiding the penalty of multiple damages under facts different from those this case presents. We need not address the insurers' hypotheticals because our holding regarding treble damages is a narrow one. Subrogation is an equitable doctrine and as such depends on the facts. The Krzykowskis settled with WEPCO. We need not address other factual scenarios.

Because we have concluded that the subrogated insurers are not entitled to treble damages and because WEPCO does not challenge the insurers' right to recover interest on the full compensatory amount of damages from the time of the verdict, we do not address the issue of when prejudgment interest should begin to accrue.

## IV.

### PREVERDICT INTEREST

The insurers assert they are entitled to preverdict interest running from the date of the fire until the date of the verdict. We disagree. The question of whether a party is entitled to preverdict interest is a question of law, which we review without deference to the circuit court. *See Ball v. District No. 4, Area Board,* 117 Wis. 2d 529, 537, 345 N.W.2d 389 (1984).

Ever since *Laycock v. Parker,* 103 Wis. 161, 79 N.W. 327 (1899), we have followed the common-law rule that a party can recover preverdict interest only on damages that are either liquidated or determinable by

776

a "reasonably certain standard of measurement . . . ." *Laycock,* 103 Wis. at 186. If the damages are liquidated or determinable, a defendant can avoid the accrual of interest by tendering the amount of the damages to the plaintiff. *Johnson v. Pearson Agri-Systems, Inc.,* 119 Wis. 2d 766, 771, 350 N.W.2d 127 (1984).

As we explained in *Wyandotte Chemicals Corp. v. Royal Electric Mfg.,* 66 Wis. 2d 577, 225 N.W.2d 648 (1975), the cases that have followed *Laycock* have staked out a middle ground between two competing policies. *Wyandotte,* 66 Wis. 2d at 583. One policy views interest as a penalty for wrongfully withholding damages legally due. *Id.* at 582. The other views interest as an element of compensation. *Id.* This second policy is premised on the concept of the "time value of money" theory, *id.,* which is based on the fact that "a dollar received today is worth more than a dollar received sometime in the future." *Johnson,* 119 Wis. 2d at 774.

■

A line of our cases has established the principle that courts do not grant preverdict interest when "the existence of multiple defendants prevents any single defendant from knowing prior to trial the precise amount of his ultimate liability." *Id.* at 781; *Wyandotte,* 66 Wis. 2d at 585; *City of Franklin v. Badger Ford Truck Sales,* 58 Wis. 2d 641, 657, 207 N.W.2d 866 (1973). This principle applies even if the plaintiff's damages are stipulated, *Wyandotte,* 66 Wis. 2d at 580, or easily determined or determinable. *Johnson,* 119 Wis. 2d at 781 (fixed medical expenses). The rationale for this rule is that it is impossible for any single defendant in a multiple-defendants case to determine the amount to tender to the plaintiff so that interest will not accrue. *Wyandotte,* 66 Wis. 2d at 587.

In addition to the common-law rules regarding preverdict interest, the legislature has provided conditions under which plaintiffs may receive preverdict interest on both liquidated and nonliquidated damages. Section 807.01(4), Stats. This statute is designed to encourage settlements. *See Johnson,* 119 Wis. 2d at 773.

In *Johnson,* we declined to modify the common-law rules which govern preverdict interest, in part because doing so might thwart the legislature's efforts to encourage settlements. In *Nicholson v. Home Ins. Cos.,* 137 Wis. 2d 581, 608–09, 405 N.W.2d 327 (1987), we again declined to modify our common-law rules and decided to leave the subject to the legislature.

The insurers never served a written offer of settlement on the defendants pursuant to sec. 807.01(3), Stats., and thus have no statutory right to preverdict interest.

What of the insurers' common-law right to preverdict interest? We agree with Pinky and WEPCO that the *City of Franklin, Wyandotte,* and *Johnson* multiple-defendants line of cases preclude preverdict interest under the common law. Even assuming that all of plaintiffs' damages were liquidated or determinable, the existence of multiple defendants precludes an award of preverdict interest. *Johnson,* 119 Wis. 2d at 781; *Wyandotte,* 66 Wis. 2d at 584–87; *City of Franklin,* 58 Wis. 2d at 657.

The insurers ask us to distinguish this case from *City of Franklin* because in this case, unlike *City of Franklin,* the jury apportioned fault between the

defendants. We decline this invitation and apply the rule that a plaintiff suing multiple defendants cannot recover preverdict interest because damages are not determinable until fault is apportioned. *See Wyandotte,* 66 Wis. 2d at 585.

The insurers also attack the rationale of this line of cases, saying it is in irreconcilable conflict with Wisconsin law. The cases the insurers cite—*Nelson v. Travelers Ins. Co.,* 102 Wis. 2d 159, 306 N.W.2d 71 (1981); *Moldenhauer v. Faschingbauer,* 33 Wis. 2d 617, 148 N.W.2d 112 (1967); and *Fehrman v. Smirl,* 25 Wis. 2d 645, 131 N.W.2d 314 (1964)—dealt with *post*verdict, not *pre*verdict, interest and thus have limited relevance to the case at hand.

*Nelson,* it is true, criticized the rationale of the multiple-defendants line of cases. *Nelson,* 102 Wis. 2d at 166–70. But *Nelson* dealt with postverdict interest under sec. 814.04(4), Stats., and its discussion of cases dealing with preverdict interest was unnecessary. Despite *Nelson's* criticisms, we reaffirmed *City of Franklin* and *Wyandotte* in *Johnson,* a case we decided after *Nelson.*

The insurers also question whether there is a meaningful difference between allocating negligence between a plaintiff and a single defendant and allocating negligence between a plaintiff and multiple defendants. We addressed this argument in *Wyandotte:*

> While a reasonable argument is made by the plaintiffs that *Franklin* provides an inequitable rule in that it differentiates between a case where the plaintiff sues multiple parties rather than just a single party, on the other hand, it must be recognized that the plaintiff exercises initial control over the number of parties against whom suit is brought,

thus no great inequity results. Moreover, it is only by acceptance of the view that injured parties' rights to full compensation are of paramount consideration that the result argued for by the plaintiffs can be justified. However, this court has never subscribed to that belief.

*Wyandotte,* 66 Wis. 2d at 586–87. This discussion in *Wyandotte* also answers the insurers' argument that the multiple-defendants line of cases should be rejected because they conflict with the policy of making the plaintiff whole and the doctrine of joint and several liability. The rights of both the plaintiff and the defendant deserve consideration when determining whether to award preverdict interest. *Id.* at 582–83.

The insurers make an extended argument based on the time value of money theory. However, we have considered such arguments previously and have previously decided that "the subject is best left to the legislature." *Nicholson,* 137 Wis. 2d at 609; *Johnson,* 119 Wis. 2d at 773–74, 781–82. We do so again today.

## V.

## *EHLINGER* AND THE BURDEN OF PRODUCTION ON CAUSATION

Pinky contends that the circuit court erred when it denied Pinky's motion, pursuant to sec. 805.14(3), Stats., to dismiss for insufficient evidence of cause at the close of plaintiffs' case-in-chief.

This issue requires us to examine the testimony of Dr. Szews, the insurers' expert. Dr. Szews testified that the fire would have started even if Pinky had properly grounded the main distribution panel. Dr. Szews explained that one of the purposes of a proper ground wire is to allow the fuse to open and operate sooner

than it would without a proper ground. When the fuse operates, any arcing downstream from the fuse would stop.

Dr. Szews explained that even if Pinky had properly grounded the main distribution panel, the fire probably would have occurred anyway because the arcing fault would not have produced a high enough current to open the fuse. Sufficient arcing to start the fire would have occurred before the fuse burned.

The insurers' theory of causation was that even though the fire would have occurred with a proper ground, a proper ground would have allowed the fuse to operate sooner than it would operate without a proper ground; and, if the fuse operated sooner, someone like Mark Krzykowski or Karen Kotar would have been able to put out the fire before it spread.

The fuse in the main distribution panel opened at some time. Yet, Dr. Szews could not say when it opened or what caused it to open: the current, the fire, or a combination of the two.

On redirect examination, the insurers' counsel attempted to ask Dr. Szews the following question:

> If that ground wire had been in place at the time of the fire, is it possible that the fuse, the main fuse, could have operated in the main disconnect and shut off the arcing by the time that Mark Krzykowski and Karen Kotar got to the basement and saw the arcing in the main distribution panel?

Counsel for Pinky objected that the question asked about a "possibility" rather than a "probability." The insurers made an offer of proof and explained their theory that *Ehlinger* addressed the burden of production required in this case. The court took the question of the admissibility of this evidence under advisement.

The court decided that if it determined that Dr. Szews' testimony was admissible, Dr. Szews would be called back to testify.

On November 19, 1990, WEPCO began its defense before the insurers had completed their case-in-chief because of witness-scheduling difficulties. On November 20, at the end of the insurers' case, Pinky, citing *Merco Distg. Corp. v. Com'l. Police Alarm Co.*, 84 Wis. 2d 455, 267 N.W.2d 652 (1978), moved to dismiss because it claimed the evidence of cause was insufficient. The insurers countered that *Ehlinger* applied. The court again took the matter under advisement.

On November 27, the court ruled that *Ehlinger* applied to this case. The court allowed counsel for the insurers to examine Dr. Szews and to ask questions regarding the cause of the fire which were phrased to satisfy the *Ehlinger* burden of production standard. For, example:

> Q If that ground to the cabinet of the main distribution panel had been installed and in place at the time of the fire as required by Code, *is it more probable than not that the fuse in the main disconnect could have operated* and cut off the arcing in the main distribution panel soon enough to allow the fire to be put out and the damage to the Beacon Bowl to be either lessened or avoided?
>
> A Yes.

(Emphasis added.) Counsel for Pinky then cross-examined Dr. Szews. Dr. Szews said that even with a proper ground wire, the fire probably would have started; that the possibility that the ground wire would have allowed someone to do anything about the fire depended on the fuse operating at the right time; and

that he could not say to a probability that the fuse would have operated at the time necessary for Karen Kotar and Mark Krzykowski to have done anything about the fire.

The first question we must address is what is the proper standard for the sufficiency of the evidence in this case. *See Fischer v. Ganju,* 168 Wis. 2d 834, 857, 485 N.W.2d 10 (1992). This is a question of law. *Id.* at 857–58. Generally, to meet their burden of production on the issue of cause, plaintiffs must produce some evidence that the defendants' negligence more probably than not caused plaintiffs' damages. *Id.* at 858. *Ehlinger* created an exception to the traditional burden of production standard.

In *Ehlinger,* a defendant doctor failed to diagnose that Mrs. Ehlinger was pregnant with twins. Consequently, the doctor did not prescribe a course of treatment to prevent premature delivery. Mrs. Ehlinger delivered twins prematurely, and the children were severely injured. The circuit court granted the defendant doctor's motion to dismiss because the Ehlingers failed to produce evidence that had the doctor diagnosed the multiple pregnancy and prescribed the proper treatment, it was more probable than not that the twins' injuries would have been lessened or avoided. We said:

> We conclude that in a case of this nature, where the causal relationship between the defendant's alleged negligence and the plaintiff's harm can only be inferred by surmising as to what the plaintiff's condition would have been had the defendant exercised ordinary care, to satisfy his or her burden of production on causation, the plaintiff need only show that the omitted treatment was intended to prevent the

783

very type of harm which resulted, that the plaintiff would have submitted to the treatment, and that it is more probable than not the treatment *could* have lessened or avoided the plaintiff's injury had it been rendered. It then is for the trier of fact to determine whether the defendant's negligence was a substantial factor in causing the plaintiff's harm.

*Ehlinger,* 155 Wis. 2d at 13–14 (emphasis in original). We reasoned that:

In a case such as presented here, where given the natures of the malady and omitted treatment the success of the treatment if instituted is not a matter of reasonable certainty, we refuse to place upon an injured plaintiff the burden of proving what more probably than not *would* have happened had the defendant not been negligent.

*Id.* at 18 (emphasis in original).

In *Fischer,* we clarified *Ehlinger's* effect on causation law. In *Fischer,* the issue was whether *Ehlinger* changed the law of causation in medical malpractice cases. *Fischer,* 168 Wis. 2d at 848. We explained that *Ehlinger* changed only the plaintiff's burden of production on causation. *Id.* at 859.

The insurers argue that *Ehlinger* applies to this case, and, therefore, Dr. Szews' testimony on November 27 satisfied their burden of production. Pinky counters that *Ehlinger* does not apply and, furthermore, the plaintiffs' case against Pinky should have been dismissed. We agree with Pinky.

We conclude that *Ehlinger* does not apply to this case because (1) this is not a case in which cause could only be inferred through proof of a negative; (2) electricity is not an inexact art like medicine; and (3)

784

applying *Ehlinger* to cases such as this may allow plaintiffs who are unable to prove causation via positive facts to submit a case to the jury which is based on speculation.

In *Ehlinger,* we noted that we were confronted by a case where the causal relationship between the defendant's negligence and the plaintiff's injuries could only be inferred by surmising what plaintiff's injuries would have been if the defendant had not been negligent. *Ehlinger,* 155 Wis. 2d at 13. This is not such a case. Plaintiffs could have produced evidence of positive facts. At the very least, plaintiffs could have produced evidence which created an inference of what caused the fire. Plaintiffs' expert could not, however, say to a probability that the fire started and spread because of Pinky's negligence.

In *Ehlinger,* we noted that "[t]he medical profession is not an exact science . . . ." *Id.* at 19. However inexact electrical science may be, this case does not contain the type of uncertainty present in *Ehlinger* or *Fischer.* In *Ehlinger,* the plaintiff was faced with proving what the twins' condition would have been had an omitted treatment been undertaken. We noted that the "difficulties involved in proving a negative fact are especially prevalent in a medical malpractice case involving a physician's misdiagnosis." *Ehlinger,* 155 Wis. 2d at 19. Similarly, in *Fischer,* the plaintiff was faced with proving what Mrs. Fischer's condition would have been had Dr. Ganju properly diagnosed her condition and taken appropriate steps.

In this case, there was testimony regarding Beacon Bowl's electrical configuration and the character of the electricity running through Beacon Bowl's lines. There was also evidence of what would have caused the fuse to work. This was not a case in which evidence of

causation could only be proved by proof of a negative fact.

Extending the *Ehlinger* burden of production beyond the medical misdiagnosis and medical omission type of case would provide plaintiffs who are unable to produce sufficient evidence of a positive fact with a fallback position. This case is a good example. The insurers were unable to produce evidence that the improper ground more probably than not caused the fire. Consequently, they then produced evidence that the improper ground could have caused the fire. Extending *Ehlinger* to cases like this would create a danger of cases going to the jury which should be dismissed because of insufficient evidence.

Furthermore, acts of negligence can often be characterized as acts of omission. If we were to extend *Ehlinger* beyond the medical omission and medical misdiagnosis type of case, many cases might reach the jury that are based on speculation or conjecture.

The insurers argue that *Ehlinger* should apply to this case. They claim that language in *Ehlinger* and *Fischer* implies that the *Ehlinger* burden of production for causation applies to all cases involving a negative fact. *Ehlinger* and *Fischer* were medical misdiagnosis cases, and, therefore, such language does not change their narrow holdings.

The insurers claim that the *Ehlinger* burden of production "serves important public policy concerns." The insurers assert that Wisconsin's tort law is fault-based, and losses are borne by those having the greatest culpability. Pinky admitted its negligence; therefore, according to the insurers, Pinky is more culpable, and the insurers should recover from Pinky. Such broad generalizations merit little response. The

rules that have evolved concerning burden of production serve many important functions, including ascertaining the truth and justice. We will not reject the traditional burden of production standard without compelling reasons such as those present in *Ehlinger* and *Fischer.*

WEPCO also claims that *Ehlinger* should apply to this case. WEPCO asserts this is so because the *Ehlinger* test was derived from sec. 323(a) of the Restatement (Second) of Torts (1965). WEPCO tells us sec. 323(a) articulates the "increased risk" theory of liability and claims we adopted this theory in *Ehlinger*. Section 323(a) does not limit itself to the medical malpractice arena. Therefore, WEPCO asserts, we should likewise decline to limit *Ehlinger.* WEPCO has misread both *Ehlinger* and *Fischer.* In *Ehlinger,* we specifically said that sec. 323(a) has nothing to do with the plaintiff's burden of production:

> Section 323(a) is generally viewed as relating only to the duty element of a negligence action. . . . Section 323(a) does not . . . lessen a plaintiff's burden of production on the issue of causation.

*Ehlinger,* 155 Wis. 2d at 12 (citations omitted). Indeed, in *Fischer,* we noted that in *Ehlinger* we "expressly abandoned the notion of an independent increased risk theory of causation . . . ." *Fischer,* 168 Wis. 2d at 856 n.5. We reject WEPCO's argument.

Having determined that the traditional "more probable than not" burden of production applies to the causation issue, we must next address whether the insurers produced sufficient evidence under this standard.

A motion challenging the sufficiency of the evidence as a matter of law should not be granted "unless the court is satisfied that, considering all credible evidence and reasonable inferences therefrom in the light most favorable to the party against whom the motion is made, there is no credible evidence to sustain a finding in favor of such party." Section 805.14(1), Stats. *See also* sec. 805.14(3), Stats.; *Christianson v. Downs,* 90 Wis. 2d 332, 334–35, 279 N.W.2d 918 (1979). When deciding a motion to dismiss at the close of the plaintiff's case, the trial court should consider "only the proof which [has] been offered by the plaintiff at the time it rested its case." *First Nat. Bank v. Sheriff of Milwaukee County,* 34 Wis. 2d 535, 541, 149 N.W.2d 548 (1967).

Having reviewed the record, we are convinced that the motion to dismiss the insurers' case against Pinky should have been granted. Dr. Szews testified that even with a proper ground wire, the fire would have started. Causation is not established by testimony that even without defendant's negligence, the harm would have occurred anyway. *See Fitzpatrick v. Rice,* 273 Wis. 201, 77 N.W.2d 515 (1956); sec. 432(1), Restatement (Second) of Torts (1965) ("[T]he actor's negligent conduct is not a substantial factor in bringing about harm to another if the harm would have been sustained even if the actor had not been negligent."). Therefore, in order to produce credible evidence that the lack of a proper ground was a cause of the plaintiffs' damages, Dr. Szews had to testify it was more probable than not that a proper ground wire would have allowed the fuse to operate in time to stop the arcing and allow people to put the fire out before it spread. Yet, Dr. Szews admit-

ted he could not testify to a probability when the fuse would operate with a proper ground.

The judge who had the advantage of watching all the testimony acknowledged that if Dr. Szews' *Ehlinger* testimony was eventually determined inadmissible, the remainder of Dr. Szews' testimony was insufficient: "He said he can't say it's probable [the fire] would have been prevented . . . . I'm not sure why you guys want to run the risk of reversible error." We conclude that the insurers produced insufficient evidence that Pinky's negligence caused their damages.

That leaves us with the issue of WEPCO's contribution rights against Pinky. Pinky argues that if this court reverses the circuit court's denial of Pinky's motion to dismiss at the close of plaintiffs' case, we must also reverse the circuit court's judgment against Pinky for contribution to WEPCO.

We agree with WEPCO that Pinky waived its right to raise this issue. We thus do not address WEPCO's rights under substantive contribution law. Pinky moved to dismiss the insurers' claim against it, but Pinky did not move to dismiss WEPCO's cross-complaint for contribution. During motions after verdict, the question arose as to whether, if Pinky's motion to dismiss were granted, Pinky would still be "in" the case. The court admitted it was confused about the issue and asked counsel for Pinky the following question:

> [D]o you think . . . you get out against plaintiffs, and you'd be out for good unless the plaintiffs subsequently nailed WEPCO, and then you'd be back in?

Counsel for Pinky responded:

I wish that we were exonerated once the Court ruled that the plaintiffs' evidence was insufficient . . . . I haven't shown the Court any authority that suggests that we can escape the cross-claim for contribution.

"The burden is upon the party alleging error to establish by reference to the record that the error was specifically called to the attention of the trial court." *Allen v. Allen,* 78 Wis. 2d 263, 270, 254 N.W.2d 244 (1977). The failure to object in a timely fashion constitutes waiver. *Id.* We generally do not consider issues that have been waived. *Id.* Pinky did not move for dismissal of WEPCO's contribution claim. Pinky did not argue that WEPCO had no right to contribution if the insurers' case were dismissed. Pinky directs us to nothing in the record that demonstrates it raised this issue. Instead, Pinky seems to argue that because the circuit court erred in allowing the jury to hear Dr. Szews' *Ehlinger* testimony, it is now impossible to determine whether WEPCO met its burden of proving common liability, an element of the contribution claim. We disagree.

WEPCO's witness Snedeker repeatedly gave strong testimony that the lack of a proper ground was a cause of the damages in this case. The circuit court, who had the advantage of observing the testimony, said that the "powerful testimony from Mr. Snedeker" made Dr. Szews' *Ehlinger* testimony seem like "a drop of water in the Fox River . . . ." Having reviewed the record, we conclude that the admission of Dr. Szews' *Ehlinger* testimony was harmless error.

# VI.

## STRICT LIABILITY

The jury concluded the electricity was both defective and unreasonably dangerous. WEPCO maintains that its electricity was neither defective nor unreasonably dangerous because voltage transients are "everywhere," and, according to WEPCO, such transients have never started a fire.

We will sustain a jury verdict if there is any credible evidence in the record to support it. *Sumnicht v. Toyota Motor Sales,* 121 Wis. 2d 338, 360, 360 N.W.2d 2 (1984). If more than one reasonable inference can be drawn from the evidence, we must accept the reasonable inference the jury drew. We search the record for evidence to sustain the jury verdict, not for evidence that might sustain a verdict the jury might have but did not reach. *Fehring v. Republic Ins. Co.,* 118 Wis. 2d 299, 305–06, 347 N.W.2d 595 (1984).

A plaintiff in a strict liability case must prove

(1) that the product was in defective condition when it left the possession or control of the seller, (2) that it was unreasonably dangerous to the user or consumer, (3) that the defect was a cause (a substantial factor) of the plaintiff's injuries or damages, (4) that the seller engaged in the business of selling such product . . ., and (5) that the product was one which the seller expected to and did reach the user or consumer without substantial change in the condition it was when he sold it.

*Dippel v. Sciano,* 37 Wis. 2d 443, 460, 155 N.W.2d 55 (1967).

Whether a product contains an unreasonably dangerous defect depends upon the ordinary consumer's reasonable expectations regarding the product. *Ransome,* 87 Wis. 2d at 621. " 'If the average consumer would reasonably anticipate the dangerous condition of the product and fully appreciate the attendant risk of injury, it would not be unreasonably dangerous and defective.' " *Id.* (quoting *Vincer v. Esther Wms. All-Alum. S. Pool Co.,* 69 Wis. 2d 326, 332, 230 N.W.2d 794 (1975)). Put another way, electricity is defective and unreasonably dangerous when it is in a condition not contemplated by the ultimate consumer and unreasonably dangerous to that consumer. *Id.* at 621–22. " 'Thus, the test in Wisconsin of whether a product contains an unreasonably dangerous defect depends upon the reasonable expectations of the ordinary consumer' . . . .. A product may be defective and unreasonably dangerous even though there are no alternative, safer designs available." *Sumnicht,* 121 Wis. 2d at 370–71 (citation omitted).

WEPCO contends that voltage transients are "common, ordinary and expected phenomena which are a normal part of the operation of every overhead electrical distribution system." It is true that no expert testified that "common" transients are unreasonably dangerous. However, we reject WEPCO's argument because both Dr. Szews and Dr. Bernstein testified that the spikes which entered Beacon Bowl were uncommon. Moreover, we have examined the record and have found credible evidence to support the jury's answer that the electricity WEPCO supplied to Beacon Bowl on the day of the fire was both defective and unreasonably dangerous.

WEPCO next argues that Beacon Bowl was uniquely susceptible to a fire and that this "unique susceptibility" was the proximate cause of the fire. We disagree.

Again, there is credible evidence in the record to support the jury's conclusion that the electricity WEPCO supplied was a cause of the fire. Consequently, we reject this argument to the extent that it implicitly argues that Pinky's negligence caused the fire.

WEPCO relies principally on *Adelman-Tremblay v. Jewel Companies, Inc.,* 859 F.2d 517 (7th Cir. 1988), to support its unique-susceptibility argument. In *Adelman-Tremblay,* a consumer suffered injuries when she had an allergic reaction to glue in an artificial fingernail kit. *Id.* at 519. She sued, alleging, among other theories, strict liability. The seventh circuit granted defendant's motion for summary judgment, concluding that plaintiff had suffered an allergic or hypersensitive reaction to the glue and that the plaintiff had therefore failed to allege that the glue was defective or unreasonably dangerous. *Id.* at 522.

*Adelman-Tremblay* has few relevant similarities to this case. The plaintiffs in this case—in contrast to the plaintiff in *Adelman-Tremblay*—did not allege a duty to warn; consequently, much of *Adelman-Tremblay* is irrelevant for our purposes. The plaintiffs in this case—in contrast to the plaintiff in *Adelman-Tremblay*—did allege a defect, and they supported that allegation with credible evidence. Moreover, unlike the rare allergy in *Adelman-Tremblay,* the lack of a proper ground and the damaged insulation on the electric wire were not rare, inherent defects. We therefore reject this argument.

## VII.

### DISCRETIONARY REVERSAL

WEPCO asks us to exercise our power of discretionary reversal. We will exercise our power of discretionary reversal only in exceptional cases. *Vollmer v. Luety,* 156 Wis. 2d 1, 11, 456 N.W.2d 797 (1990). This certainly is not such a case. With the exception of the treble damages issue, we have already concluded that the circuit court did not err as WEPCO claims it did. WEPCO gives us no other reasons to suppose justice has not been done.

*By the Court.*—The portion of the judgment of the circuit court granting treble damages is reversed. The remainder of the judgment is affirmed, and the cause is remanded to the circuit court.