Jay R. BRANDNER, a minor by his Guardian ad Litem, Rock Brandner, Plaintiffs-Respondents,

v.

ALLSTATE INSURANCE COMPANY, Economy Fire & Casualty Company, JCPenney Casualty Insurance Company and Jeffrey R. Brandner, Defendants-Co-Appellants,

Stuart A. LARSON, Kay Larson and West Bend Mutual Insurance Company, Defendants-Appellants,

COMPCARE HEALTH SERVICES INSURANCE CORPORATION, Defendant-Respondent.

Supreme Court

*No. 92–1272. Oral argument November 9, 1993.—Decided March 9, 1994.*

(On certification from the court of appeals.)

(Also reported in 512 N.W.2d 753.)

For the defendants-appellants there were briefs (in the court of appeals) by *Andrew T. Gonring* and *O'Meara, Eckert, Pouros & Gonring,* West Bend, and oral argument by *Andrew T. Gonring.*

For the defendants-co-appellants there were briefs (in the court of appeals & supreme court) by *Gerald J. Mayhew, Arthur J. Vlasak and Robert W. Huff* and *Vlasak, Rosenbaum, Weede; Ahmed J. Quereshi* and *Riordan, Crivello, Carlson, Mentkowski & Steeves, S.C.; Leslie A. Hayes, Jr.* and *Blazek, Hayes & Ray,* all

of Milwaukee, and oral argument by *Ahmed J. Quereshi.*

For the defendant-respondent there was a brief (in the court of appeals) by *Robert I. Wertheimer* and *Compcare Health Services Insurance Corporation* and oral argument by *Robert I. Wertheimer.*

For the plaintiffs-respondents there was a brief (in court of appeals and supreme court) by *Stanley J. Lowe* and *Techmeier & Lowe, S.C.,* Milwaukee and oral argument by *Stanley J. Lowe.*

JON P. WILCOX, J.   This case comes before the court on certification by the court of appeals pursuant to sec. (Rule) 809.61, Stats. The issue is what effect the "Loy Releases/Covenants Not To Sue" (releases) executed by plaintiffs and the subrogated insurer in favor of one joint tortfeasor have on the rights of the non-settling joint tortfeasors and the settling joint tortfeasor's excess insurers. The trial court determined that under the terms of these releases a) plaintiffs and the subrogated insurer released the excess insurers from liability below the primary insurer's policy limits, b) non-settling joint tortfeasors were wholly liable for all damages awarded to plaintiffs and the subrogated insurer, and c) non-settling joint tortfeasors retained their rights to contribution against the settling tortfeasor and his excess insurers.

The non-settling joint tortfeasors appeal that portion of the judgment holding them liable in the first instance for all the damages awarded. The settling joint tortfeasor and his excess insurers appeal that portion granting the non-settling joint tortfeasors' cross-claims for contribution against them.

We hold as follows. First, we agree with the trial court that these releases operate as *Loy*-type releases[1] with respect to the excess insurers, thereby releasing them from liability to plaintiffs and the subrogated insurer for damages below the primary insurer's policy limits. Because in this case the damages awarded were less than the primary insurer's limits, plaintiffs' and the subrogated insurer's claims against the excess insurers were properly dismissed. Second, we believe that these releases operate as *Pierringer*-type releases[2] with respect to the non-settling joint tortfeasors, thereby a) limiting their liability to an amount proportionate to the causal negligence attributed to them by the jury, and b) extinguishing their right to contribution against the settling joint tortfeasor and his excess insurers.

This case has its origins in a one-car automobile accident that occurred on February 20, 1988. The driver, Jeffrey R. Brandner, lost control of the vehicle when a dog owned by Stuart A. Larson and Kay Larson (Larsons) crossed in front of the car he was operating. The car's owner, Sean P. Fitzwilliams, was a passenger at the time of the accident, as was Jeffrey's younger brother, Jay A. Brandner. The insurance issues in this case all stem from injuries Jay suffered during the accident.

The primary insurer of the Fitzwilliams automobile was State Farm Mutual Automobile Insurance Company (State Farm). Liability coverage under State Farm's policy was limited to $100,000. In addition, Jeffrey Brandner was insured under three separate policies, each of which contained "other insurance"

---

[1] *Loy v. Bunderson,* 107 Wis. 2d 400, 320 N.W.2d 175 (1982).
[2] *Pierringer v. Hoger,* 21 Wis. 2d 182, 124 N.W.2d 106 (1963).

clauses providing that in the event Jeffrey was operating a vehicle he did not own at the time of an accident, coverage under the policies would be excess over any other collectible insurance. These policies were issued by Allstate Insurance Company, Economy Fire and Casualty Company, and JCPenney Casualty Insurance Company (excess insurers). The Larsons were insured by West Bend Mutual Insurance Company (West Bend).[3]

Prior to trial, plaintiffs executed what they termed a "Loy Release/Covenant Not To Sue" in favor of State Farm and Jeffrey Brandner. Part I of that document was captioned,

> RELEASE OF JEFFREY R. BRANDNER AND STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY FOR LIABILITY TO THE EXTENT OF STATE FARM'S INSURANCE COMPANY'S LIMITS

and provided that in exchange for $80,000, plaintiffs completely released State Farm and Jeffrey Brandner from any and all claims up to but not exceeding $100,000. Later sections of the release included plaintiffs' stipulation "to the dismissal with prejudice and on the merits" of their pending action against Jeffrey Brandner and State Farm, as well as their pledge to "never prosecute, commence or continue any suit" against Jeffrey Brandner or State Farm.

In contrast to these provisions, the release expressly reserved plaintiffs' rights to proceed against the excess insurers for damages exceeding State Farm's $100,000 policy limits. Plaintiffs also reserved their claims against the Larsons.

---

[3] Unless otherwise indicated, the Larsons and West Bend are hereinafter referred to collectively as "the Larsons."

The release also included an "INDEMNIFICA-TION" section in which plaintiffs agreed to "indemnify and hold harmless" Jeffrey Brandner and State Farm from any claims that may be made against them by the excess insurers or the Larsons. Plaintiffs further agreed to offset any claim they may have against the excess insurers or the Larsons "to the extent of any amount of any collectible claim that said non-settling defendants may enforce against Jeffrey R. Brandner and State Farm."

Finally, the release contained the following paragraph:

> This release hereby credits and satisfies that portion of the total amount of damages of [plaintiffs] which has been caused by the negligence, if any, of Jeffrey R. Brandner to the extent of . . . $100,000 . . . as if the full sum of . . . $100,000 . . . has been paid. This release, however, does not purport to satisfy any obligation of Jeffrey R. Brandner on the basis of satisfying or releasing any percentage of negligence which might be attributable to him by a judge or jury in later proceedings. In other words, this is not a "Pierringer" type release.

The subrogated insurer, Compcare Health Services Insurance Corporation (Compcare), executed a virtually identical release in favor of Jeffrey Brandner and State Farm in exchange for $10,000. Neither the excess insurers nor the Larsons were party to these releases.

Following execution of the releases, all parties stipulated to State Farm's dismissal from the suit. Jeffrey Brandner remained as a defendant, represented by counsel for the excess insurers.

On November 14, 1991, after a four day trial, the jury returned its special verdict, allocating 85 percent

1063

of the accident's causal negligence to Jeffrey Brandner and 15 percent to the Larsons. It proceeded to award $20,000 to Jay Brandner for his pain, suffering, and disability and $38,610.75 to Compcare for the medical and hospital expenses it had incurred on Jay's behalf.

After the verdict, the parties filed a number of motions with the trial court. Plaintiffs moved for additur on the grounds that the $20,000 awarded by the jury was inadequate. The excess insurers moved to have plaintiffs' and Compcare's claims against them, as well as any and all cross-claims, dismissed. Such dismissals were necessary under the releases, they argued, given this court's reasoning in *Loy,* and *Teigen v. Jelco of Wisconsin, Inc.,* 124 Wis. 2d 1, 367 N.W.2d 806 (1985). The Larsons moved the court to determine their liability to Compcare, arguing that the release executed by Compcare was in effect a *Pierringer*-type release which limited their liability to 15 percent of the jury award.[4] The Larsons did not request a similar determination regarding their liability to plaintiffs. Compcare moved for an order declaring that damages awarded to the plaintiffs by the jury were inadequate, or in the alternative, that the court enter judgment in its favor against West Bend in the amount of $5,700.[5]

Argument on these motions was heard on December 4, 1991. That hearing was devoted almost exclusively to plaintiffs' motion for additur. As to the

---

[4] The Larsons and West Bend also moved the court to offset their statutory costs and disbursements against plaintiffs' judgment under sec. 807.01, Stats., because plaintiffs had rejected a settlement offer of $62,500. The trial court granted this motion in its Decision on Motions After Verdict dated January 27, 1992, and that award has not been appealed.

[5] $5,700 equates to 15% of $38,000. In its motion, Compcare simply truncated the $38,610.75 damages figure to $38,000.

Larsons' motion, all the parties appeared to agree that the Larsons' liability to Compcare would be limited to 15 percent of whatever damages the court awarded Compcare.

Following the December 4th hearing, Compcare submitted a brief which for the first time asserted that the Larsons were liable for its entire damages. In so doing, Compcare relied on the fact that generally, under Wisconsin law, joint tortfeasors can be held jointly and severally liable for all of a plaintiff's damages. It also cited language in its release which purportedly reserved its entire cause of action against the Larsons.

The trial court ruled on these post-verdict motions on January 27, 1992. First, it granted plaintiffs' request for additur, increasing their total judgment from $20,000 to $60,000. Next, it dismissed plaintiffs' and Compcare's claims against the excess insurers, as well as "any and all cross claims" against the excess insurers. Included among the cross-claims so dismissed were the Larsons' contribution actions. Finally, the court held that as joint tortfeasors, the Larsons were jointly and severally liable for Compcare's damages. The net effect of the January 27th decision was to leave the Larsons 100 percent liable for all damages awarded, while at the same time extinguishing their rights to contribution against Jeffrey Brandner and the excess insurers.

Recognizing this, the Larsons moved the trial court to reconsider its January 27th decision. On February 28, 1992, the court obliged, issuing a "Supplemental Decision." In its new decision, the court concluded that because the Larsons were not party to the releases, it violated "natural justice" to hold that those releases extinguished their rights to contribu-

tion. Accordingly, the court reversed its previous dismissal of the Larsons' cross-claims for contribution, and ordered that judgment be entered on those claims. Other aspects of the January 27th decision remained unaffected. As a result, the judgment eventually docketed on April 14, 1992 provided for the following: 1) dismissal of plaintiffs' and Compcare's claims against the excess insurers 2) judgment against the Larsons for the entire amount of damages awarded plaintiffs and Compcare, and 3) judgment in favor of the Larsons on their contribution action against Jeffrey Brandner and the excess insurers in the amount of $75,319.14.[6]

As noted, two appeals were taken from that judgment. The Larsons have appealed the portion which holds them wholly liable in the first place for the damages awarded plaintiffs and Compcare, while Jeffrey Brandner and the excess insurers appeal that portion which grants the Larsons' cross-claim for contribution.

Before proceeding to the merits of those appeals, we address several procedural matters. First, plaintiffs contend that the Larsons waived their right to appeal by failing to raise their arguments in their post-verdict motions. Citing language from *Beacon Bowl v. Wisconsin Electric Power Co.,* 176 Wis. 2d 740, 790, 501 N.W.2d 788 (1993), they argue that it was the Larsons' burden to bring any alleged errors to the attention of the trial court.

We agree with much of what plaintiffs say in this respect. For instance, it is undisputed that the Larsons' post-verdict motions fail to explicitly question their liability to plaintiffs. Even if such a failure constitutes "waiver," however, our consideration of the issue is not

---

[6] That figure represents 85 percent of plaintiffs' damages ($60,000) plus 85 percent of Compcare's damages reduced by the $10,000 settlement Compcare had previously received.

precluded. As this court explained in *Hartford Insurance Co. v. Wales,* 138 Wis. 2d 508, 518, 406 N.W.2d 426 (1987):

> Numerous Wisconsin cases have held that a party's failure to properly or timely raise issues in the trial court by postverdict motions results only in a waiver of the opportunity for an appeal *as of right* on those issues. The reviewing court does not lose jurisdiction to consider such issues but may consider them in its discretion. (Emphasis in original.)

That discretionary power has been codified at sec. 751.06, Stats., which provides in part that:

> In an appeal in the supreme court, if it appears from the record that the real controversy has not been fully tried, or that it is probable that justice has for any reason miscarried, the court may reverse the judgment or order appealed from, regardless of whether proper motion or objection appears in the record, and may direct the entry of the proper judgment or remit the case to the trial court for the entry of the proper judgment . . ..

While we use this discretionary power sparingly, we do not hesitate to employ it when the interests of justice so require. *Wells v. Dairyland,* 274 Wis. 505, 514, 80 N.W.2d 380 (1957).[7] Our review of the record

---

[7] In *State v. Wyss,* 124 Wis. 2d 681, 370 N.W.2d 745 (1985), we held that an appellate court can exercise its discretion to grant new trials under sec. 752.35, Stats. or 751.06 when either 1) the real controversy has not been fully tried, or 2) it is probable that justice has for any reason miscarried. *Id.* at 735. The second of these requires the court to determine to a substantial degree of probability that a new trial would produce a different result. *Id.* at 734. In this case, the jury trial dealt solely with the

leads us to conclude that the exercise of that power in this case is justified.

Prior to the January 27, 1992 decision, it is clear that the Larsons had little if any reason to anticipate that the trial court would hold them 100 percent liable for plaintiffs' damages. For one thing, prior to that date, plaintiffs themselves had never clearly argued that that should be the case. This is evidenced in remarks made by plaintiffs' counsel during the December 4, 1991 hearing:

> There is an issue as to the applicability of the offer of settlement made jointly by the defendants and severally. Concerning all the issues that are involved here, I am not prepared to say if there is really several liability or jointly or whatever. I am not sure. If I had to argue here, I would say that I would have to argue that there is joint and several liability here, but then you have the offer of settlement which does have some effect, but I really don't know. I'd like to be more sure on that and have additional time.

Following these remarks, counsel for the Larsons' questioned whether joint and several liability was appropriate in this case. He also asked the court for additional time, as well as another hearing, to develop

---

issues of negligence and damages, and the parties do not in any respect challenge the integrity of that process. Rather, the controversy arises from the trial court's handling of various post-conviction motions, unrelated to the actual trial itself. Thus, unlike *Wyss,* we are not relying on sec. 751.06 to grant a new trial, but rather to consider a legal issue regardless of whether "proper motion or objection appears in the record . . .." Section 751.06.

the issue more thoroughly. The trial court agreed, and asked parties to further brief the liability issue.[8]

Plaintiffs chose not to accept the court's invitation. Compcare, on the other hand, did, arguing for the first time that the Larsons were responsible for its entire damages. It is not surprising, then, that the Larsons' post-verdict motion and reply brief were devoted exclusively to their liability to Compcare. From the Larsons' perspective, plaintiffs' failure to brief the issue or to bring a motion must undoubtedly have signalled their abandonment of the joint and several liability theory.

In fact, it was not until after the January 27th decision that plaintiffs finally asserted that the Larsons should be held liable for all their damages. When they did, the Larsons immediately voiced their objections. Thus, unlike as occurred in *Beacon Bowl,* the Larsons brought the alleged error to the trial court's attention, thereby enabling the court to consider the matter and, if necessary, to correct its own errors.[9]

---

[8] The record also indicates that at the December 4th hearing, the court agreed to defer its decision on the liability issues until after it ruled on plaintiffs' motion for additur. The court also indicated that further argument on the liability issues would be heard at that time. Instead, the January 27th decision not only granted the additur motion, but went on to hold the Larsons' jointly and severally liable for all damages.

[9] In *Beacon Bowl,* two joint tortfeasors, Pinky and WEPCO, were found causally negligent for a fire which damaged the Beacon Bowl facility. The resulting judgment held them jointly and severally liable, but preserved their contribution claims against each other. On appeal, we held that the negligence suit against Pinky should have been dismissed for lack of evidence. *Beacon Bowl,* 176 Wis. 2d at 789. Pinky tried to argue that as a result of this dismissal, WEPCO's contribution action should also be dismissed. We disagreed, noting that Pinky failed to

Finally, it is significant that a non-settling joint tortfeasor's liability under purported "Loy Releases/Covenants Not To Sue" was, prior to this case, an unresolved question in Wisconsin. This is not a case where a party simply neglected to preserve an objection. Here, the record plainly reveals that the parties and the trial court were unsure how the releases were to be given effect. This is perhaps attested to most clearly in the supplemental decision itself, where the trial court confessed that its original decision was inconsistent and contravened "natural justice." That miscarriage of justice would compound were the Larsons now prevented from having this court hear their appeal.

The second procedural issue concerns the timeliness of the trial court's supplemental decision. Section 805.16(3), Stats., entitled, "Time for Motions After Verdict," states that:

> If within 90 days after the verdict is rendered the court does not decide a motion after verdict on the record or the judge, or the clerk at the judge's written direction, does not sign an order deciding the motion, the motion is considered denied and judgment shall be entered on the verdict.

In this case, the jury reached its verdict on November 14, 1991. The trial court's supplemental decision was issued on February 28, 1992, more than 90 days after the verdict. In *Watts v. Watts,* 152 Wis. 2d 370, 378, 448 N.W.2d 292, (Ct. App. 1989), the court held that a trial court loses its competency to decide post-verdict motions after the 90 day time limit of sec.

---

make this argument in the trial court despite having the trial court itself specifically raise the issue with him. *Id.* at 789–90.

805.16(3), Stats. has expired. *See also, Brookhouse v. State Farm Mutual Automobile Insurance Company,* 130 Wis. 2d 166, 168, 387 N.W.2d 82 (Ct. App. 1986). We agree, and therefore conclude that the supplemental decision in this case is a nullity.[10]

A trial court's failure to conform with sec. 805.16, Stats., however, does not strip this court of its discretionary powers under sec. 751.06. In *Jos. P. Jansen Co., Inc. v. Milwaukee Area Dist. Etc.,* 105 Wis. 2d 1, 312 N.W.2d 813 (1981), the trial court waited more than five months before deciding several postverdict motions. Consequently, this court held that those decisions were void because they were made after the trial court lost competency to exercise its jurisdiction over the motions. *Id.* at 9–10. Nonetheless, we concluded that the trial court's failure in that regard did not foreclose an appellate court from invoking its power under sec. 751.06, "to accomplish the same result that the trial court attempted to accomplish but was unable to because of its loss of the capacity to exercise jurisdiction." *Id.* at 10.

Because we have determined that the supplemental decision is void, were we to proceed no further, the January 27th decision would stand as the final interpretation of the releases at issue. The trial court itself later characterized that decision as inconsistent and a violation of natural justice. As the remainder of this decision illustrates, we have come to share that assess-

---

[10] The trial court, in apparent recognition of sec. 805.16(3), Stats., attempted to relate its supplemental decision back to January 27, 1992. It is clear that such an attempt to "relate back" an otherwise untimely decision on motions after verdict is ineffectual, especially in light of sec. 801.15(2)(c), which states that, "The time for . . . deciding motions after verdict under s. 805.16(3) . . . may not be enlarged."

ment. Not only does the January 27th decision reflect incorrect legal analysis, more importantly it offends basic notions of justice and fair play. As our earlier cases illustrate, the trial court's failure to correct these flaws in a timely fashion does not prevent this court from doing so pursuant to our discretionary power under sec. 751.06, Stats. We believe the exercise of that power is more than warranted in this case. Accordingly, we proceed to the substantive issues presented in these appeals.

The trial court correctly noted that generally, Wisconsin common law permits a plaintiff to collect the total damages to which he is entitled from any of several joint tortfeasors whose negligence combined to cause his injury. *Mulder v. Acme-Cleveland Corp.*, 95 Wis. 2d 173, 178, 290 N.W.2d 276 (1980). Wisconsin also recognizes the corresponding rights of joint tortfeasors to seek contribution from their fellow joint tortfeasors so as to allocate liability based on comparative negligence principles. *Id.*

In addition, we have recognized the desirability of allowing plaintiffs to settle with some parties while preserving their causes of action against others. Such settlements can help foster the effective and expeditious resolution of lawsuits, thereby benefitting not only the parties involved, but the entire justice system. *Tiegen,* 124 Wis. 2d at 7.

We have, in the past, examined the interplay of these occasionally competing principles. Two of our cases in this area, *Loy v. Bunderson,* and *Pierringer v. Hoger,* are recognized by the parties as being central to the issues at hand. Therefore we begin our analysis with a review of those cases.

In *Pierringer,* the plaintiffs initiated suits against a number of alleged joint tortfeasors. These defendants

in turn cross-complained against each other for contribution. Prior to trial, all the defendants but one settled with the plaintiffs. *Pierringer,* 21 Wis. 2d at 183. In exchange for these settlements, plaintiffs agreed to "credit and satisfy that portion of the total amount of damages" caused by the negligence of the settling defendants, and to "release and discharge" that percentage of their total claim for damages against all parties proportionate to the negligence later attributed to the settling defendants. *Id.* at 184–85. They further agreed to indemnify the settling tortfeasors for any judgments obtained against them for contribution. *Id.* at 185. Finally, while the releases reserved the balance of plaintiffs' whole cause of action against the non-settling defendant, it also contained their agreement to satisfy any judgment for the full cause it obtained against the non-settling defendant to the extent of the fraction of the cause of action released. *Id.*

An issue on appeal was whether these releases extinguished the non-settling joint tortfeasor's rights to contribution. This court found that they had. Specifically, we held that the releases satisfied that portion of the plaintiffs' claims attributable to the settling joint tortfeasors' negligence. *Id.* at 188–89. As a result, the only damages for which the non-settling joint tortfeasor remained potentially liable were those attributable to his own negligence. Since he could no longer be held liable for damages caused by the settling joint tortfeasors' negligence, the non-settler's rights to contribution against the settlers were extinguished.

The situation in *Loy* was somewhat different. In *Loy,* plaintiff's wife was killed when her car was struck by two other vehicles. *Loy,* 107 Wis. 2d at 403. The driver of one of those vehicles, Ralph Truesdill, was personally insured by General Casualty under a

$50,000 liability policy.[11] *Id.* In addition, Truesdill's employer (Truesdill was in the course of his employment with Chambers & Owen at the time of the accident) carried a $500,000 liability policy with Travelers Insurance Company. The Travelers policy was effectively an "excess" policy, due to the operation of an "other insurance" clause. *Id.* at 405.

Prior to trial, Loy executed a "release" in favor of General Casualty and Truesdill whereby in exchange for $20,000, he agreed to release those parties from any liability up to $50,000. The document reserved Loy's cause of action against Truesdill, however, for damages in excess of $50,000 but less than the limits of any excess coverage. *Id.* Loy also reserved his claims against the other tortfeasor and her insurer. *Id.* at 416. Finally, under the terms of the agreement, Loy reserved his claim against Travelers, but agreed to credit any recovery he might receive from them with the sum of $50,000. *Id.* at 416.

The central issue in *Loy* was whether Travelers' rights had been adversely affected by these agreements. This court observed the following with respect to that question:

> The effect of this is that General Casualty has discharged *in toto* the obligation to its insured because, in effect, the plaintiff Loy has been satisfied insofar as Chambers & Owen and Truesdill are concerned as if the $50,000 limit of the General Casualty coverage had been paid ... Moreover, General Casualty

---

[11] There was a joint tortfeasor in *Loy.* A footnote in the opinion, however, stated that separate settlement had been made with that tortfeasor's insurance carrier, and that that carrier's liability was not at issue in the case. *Loy,* 107 Wis. 2d at 403 n.2.

> has in no way prejudiced the rights of Travelers . . . Because the plaintiff has agreed that the payment made to him by General Casualty will be credited in the amount of $50,000 against any possible recovery against Travelers, Travelers has received the benefit of its policy provision and is only exposed to liability for sums in excess of the policy limits of the primary carrier.

*Id.* at 417.

Significantly, the *Loy* court characterized the agreement in that case as essentially a "covenant not to sue," rather than a true release of a portion of the plaintiff's cause of action, as occurred in *Pierringer. Id.* at 420–21. As we observed in a subsequent case, the critical distinction is that unlike a *Pierringer* release, a covenant not to sue preserves the plaintiff's entire cause of action against the non-settling joint tortfeasor, including that portion attributable to the settling tortfeasor's negligence. As a result, a covenant not to sue does not extinguish a non-settling joint tortfeasor's contribution rights, while a *Pierringer* release does. *Imark,* 148 Wis. 2d at 621–22 (1989).

The releases at issue here are not entirely comparable to those in either *Loy* or *Pierringer.* In fact, they incorporate aspects of both. Regarding the excess insurers' liability to plaintiffs (and Compcare), we find that they are, in effect, *Loy* covenants not to sue. In other words, here, as in *Loy,* the clear intent of the parties was to release the excess insurers from any liability below State Farm's primary coverage limits of $100,000. This is unambiguously reflected in the caption to Part I of the agreement, which reads:

> "Release of Jeffrey R. Brandner and State Farm Mutual Automobile Insurance Company For Liabil-

ity To The Extent Of State Farm Insurance Company's Limits."

Because in this case the damages awarded were less than $100,000, plaintiffs' and Compcare's claims against the excess insurers were properly dismissed. While that particular aspect of the trial court's judgment was not appealed, we included this discussion to provide a thorough overview of these interrelated issues.

As to the Larsons' liability to plaintiffs, however, we find that these releases operate as *Pierringer*-type releases. As in *Pierringer,* that portion of plaintiffs' and Compcare's causes of action attributable to Jeffrey Brandner's negligence has been completely satisfied. Again, the parties' intent in this regard is clearly revealed in the wording of the documents themselves. Most notable in that respect is the following excerpt from Part I of the releases:

> This release hereby credits and satisfies that portion of the total amount of damages of Jay R. Brandner and Rock Brandner which has been caused by the negligence, if any, of Jeffrey R. Brandner, to the extent of One Hundred Thousand and 00/100 Dollars ($100,000) . . ..

This language unambiguously states that those portions of plaintiffs' and Compcare's damages, up to $100,000, attributable to Jeffrey Brandner's negligence have been satisfied. Since in this case, those parties' damages were less than $100,000, their claims attributable to Jeffrey Brandner's negligence have been completely satisfied. As a result, that part of the judgment which held the Larsons wholly liable for all the damages awarded in this case, including those

attributable to Jeffrey Brandner's negligence, must be reversed.

Moreover, because the releases leave the Larsons responsible only for that portion of the damages attributable to their own negligence, their rights to contribution against Jeffrey Brandner and the excess insurers are extinguished. To the extent the judgment docketed provides otherwise, we now reverse.[12]

This result is confirmed in the "INDEMNIFICATION" section of the releases. In addition to plaintiffs' (and Compcare's) pledge to "indemnify" Jeffrey Brandner and State Farm from claims "of whatever nature" the Larsons may bring against them, that section also includes their promise to "offset" any amount they may collect against the Larsons to the extent of any collectible claim the Larsons may enforce against Jeffrey Brandner and State Farm. This language is characteristic of *Pierringer*-type releases, as the following description from *Imark* indicates:

> Consequently, we have held that a *Pierringer* release operates to impute to the plaintiff whatever liability in contribution or indemnity the settling joint tortfeasor may have to the nonsettling joint tortfeasor and to bar subsequent contribution or indemnity actions the non-settling joint tortfeasor might assert against the settling joint tortfeasor.

*Imark,* 148 Wis. 2d at 621–22.

Here, as with all *Pierringer*-type releases, plaintiffs and Compcare have effectively "imputed" to themselves that portion of the liability attributable to Jeffrey Brandner's negligence. They have done this in

---

[12] Technically, the supplemental decision upon which the judgment was based has been declared void. We continue to refer to that judgment here simply for ease of reference.

part by agreeing to "offset" any judgment they receive from the Larsons by that amount which the Larsons could, absent these releases, enforce against Jeffrey Brandner. In this case, of course, such amounts include the Larsons' rights to contribution in an amount equal to 85 percent of the damages. The net result is that the Larsons are, under the terms of the release, responsible only for 15 percent of the damages.

We are aware, of course, that the agreement contains the following language:

> This release, however, does not purport to satisfy any obligation of Jeffrey R. Brandner on the basis of satisfying or releasing any percentage of negligence which might be attributable to him by a judge or jury in later proceedings. In other words, this is not a "Pierringer"-type release.

We note, also, that the releases were entitled "Loy Releases/Covenants Not To Sue." Such language, in isolation, would indicate that contrary to our interpretation, the parties intended that these agreements not operate as *Pierringer* releases. Releases should be construed to give effect to the intention of the parties. *Brown v. Hammermill Paper Co.,* 88 Wis. 2d 224, 233–34, 276 N.W.2d 709 (1979). The parties' intent, though, "must be sought from the whole and every part of the instrument and from the surrounding conditions and circumstances." *Id.* at 234. Moreover, the law favors interpretations that give a reasonable meaning to all the language of a release. *Fleming v. Threshermen's Mutual Ins. Co.,* 131 Wis. 2d 123, 132, 388 N.W.2d 908 (1986). The determination of the intent of the parties to a release is a question of fact and will be upheld unless clearly erroneous. *Brown,* at 234.

In its January 27th decision, the trial court determined that the parties did not intend these releases to be *Pierringer*-type releases. It then proceeded to hold the Larsons totally liable for all the damages awarded while extinguishing their rights to contribution. That determination ignored significant portions of the documents and produced an absurd result. As a result, it was clearly erroneous.

As illustrated, substantial portions of the agreements indicate that the parties intended them to operate as *Pierringer*-type releases. In particular, plaintiffs and Compcare agreed to "credit and satisfy" that portion of their claims, up to $100,000, attributable to the negligence of Jeffrey Brandner. They agreed to "offset" any recovery they attained against the Larsons to the extent of any cross-claims the Larsons could bring against Jeffrey Brander. Finally, they agreed to "indemnify and hold harmless" Jeffrey Brandner and State Farm from the Larsons' contribution actions. All of these provisions reveal the parties' clear intent to enter into a *Pierringer*-type release, at least with respect to the liability of the Larsons.

More importantly, perhaps, any other interpretation would be an absurdity. But for these releases, a) the Larsons could seek contribution from Jeffrey Brandner, their joint tortfeasor, for 85 percent of the damages, and b) the excess insurers contractually would have no liability for the first $100,000 in damages. To hold that these important rights can be taken away by the operation of releases to which the Larsons and the excess insurers were not even party would be patently unfair.[13]

---

[13] We realize, of course, that in a *Pierringer* release, a nonsettling tortfeasor's rights to contribution are extinguished. That result is totally predicated, however, on the fact that under

In summary, we hereby order that judgment in this case be entered consistent with the following mandate. First, that portion of the trial court's judgment dismissing plaintiffs' and Compcare's claims against the excess insurers is affirmed. Second, that portion of the judgment holding the Larsons fully liable for the damages awarded plaintiffs and Compcare is reversed, and judgment against the Larsons in favor of the plaintiffs and Compcare in an amount equal to 15 percent of their damages shall be entered. In the case of the plaintiffs, that equates to 15 percent of $60,000, or $9,000. In Compcare's case, the figures are 15 percent of $38,610.75, or $5,791.61.[14] Finally, we reverse that

such releases, the non-settling tortfeasor can no longer be held liable for damages attributable to the settling joint tortfeasor's negligence. Here, the trial court's January 27th decision extinguished the Larsons' rights to contribution, but left them liable for the entire amount of damages.

Compcare argues that the court of appeals decision in *Balk v. Farmers Insurance Exchange,* 138 Wis. 2d 339, 405 N.W.2d 792 (Ct. App. 1987) compels a different result. In reality, *Balk* supports our approach. The holding in that case was based in part on the court's determination that the excess insurer had not been prejudiced by the release "because it is not asked to pay more than it contracted to pay." *Id.* at 349. Here, the trial court's supplemental decision makes the excess insurers liable despite the fact that their policies were to provide coverage only in excess of the first $100,000 in damages.

[14] The Larsons argue that their liability to Compcare should be limited to 15% of $28,610.75. That argument misunderstands the effects of a *Pierringer* release. Compcare's damages, as determined by the jury, totalled $38,610.75. In exchange for $10,000, Compcare satisfied that portion of its claim attributable to Jeffrey Larson's negligence, or 85% of $38,610.75. It preserved its claim attributable to the Larsons' negligence, or 15% of $38,610.75.

portion of the judgment which awarded the Larsons' cross-claim for contribution against Jeffrey Brandner and the excess insurers, and in its place, order that those cross-claims be dismissed.

*By the Court.*—Judgment of the trial court reversed in part, affirmed in part, and the cause is remanded to the trial court for an entry of judgment consistent with this opinion.