Delores SAWYER, special administrator of the estate of Nancy K. Anneatra, Thomas Sawyer and Delores Sawyer, Plaintiffs-Appellants,

v.

H. Berit MIDELFORT, M.D. and Celia Lausted, Defendants-Respondents-Petitioners,

ABC INSURANCE COMPANY and DEF Insurance Company, Defendants.

Supreme Court

No. 97–1969. *Oral argument December 2, 1998.—Decided June 29, 1999.*

(Also reported in 595 N.W.2d 423.)

127

For the defendants-respondents-petitioners there were briefs by *Kay Nord Hunt, Thomas R. Jacobson, Brent R. Johnson* and *Lommen, Nelson, Cole & Stageberg, P.A.*, Hudson; *Thomas J. Misfeldt, James W. Flory* and *Misfeldt, Stark, Richie & Wickstrom*, Eau Claire and oral argument by *Kary Nord Hunt*.

For the plaintiffs-appellants there was a brief by *William Smoler, Gregory P. Seibold* and *Murphy & Desmond, S.C.*, Madison and oral argument by *William Smoler & Gregory P. Seibold.*

Amicus curiae was filed by *Mark L. Adams* and *State Medical Society of Wisconsin* and *Jeffrey J. Kassel, David E. McFarland* and *Lafollette & Sinykin*, all of Madison for the State Medical Society of Wisconsin.

Amicus curiae was filed by *David D. Relles* and *Relles, Meeker & Borns*, Madison; *Thomas A. Pavlinic*, Annapolis, MD for The False Memory Syndrome Foundation.

¶ 1. DONALD W. STEINMETZ, J. The petitioners seek review of a published decision of the court of appeals, *Sawyer v. Midelfort*, 217 Wis. 2d 795, 579 N.W.2d 268 (Ct. App. 1998), which affirmed in part and reversed in part a judgment of the Circuit Court for Eau Claire County, the Honorable Eric J. Wahl. The circuit court granted summary judgment ordering the dismissal of the plaintiffs' professional negligence claims against the defendants Dr. H. Berit Midelfort (Midelfort) and Celia Lausted (Lausted) and their negligent infliction of emotional distress claim against

Lausted. The circuit court concluded that the professional negligence claims brought by Delores and Thomas Sawyer (the Sawyers) failed to state claims upon which relief could be granted, and, in the alternative, were barred by the statute of limitations.[1] The circuit court also concluded that the claim brought by Nancy Anneatra's Estate (the Estate) was barred on grounds of public policy. The court of appeals reversed as to each of these rulings.[2]

¶ 2. The following issues are presented for our review:

¶ 3. (1) May the parents of an adult child maintain third-party professional negligence actions wherein they allege that the defendants' negligent therapy and psychiatric care resulted in the implanting and reinforcing of false memories of sexual abuse in their child?

¶ 4. (2) Where a patient has not sustained physical injury, do claims of professional negligence on behalf of the patient's estate for "pain, suffering and disability, medical, psychiatric and psychological expense and loss of enjoyment of life," survive under Wis. Stat. § 895.01 and/or are such claims otherwise barred on public policy grounds?

---

[1] Although the circuit court did not specifically address the Sawyers' negligent infliction of emotional distress claim against Lausted, we understand the court's dismissal of the Sawyers' claims on the grounds that they were barred by the statute of limitations to apply equally to all the Sawyers' claims.

[2] Midelfort also asserted as a defense that Minnesota law applied to the claims against her. The circuit court ruled that Wisconsin law governed the claims against Midelfort. The court of appeals affirmed. This issue was not argued or briefed in this court, and we consider the issue waived.

¶ 5. (3) Does Wisconsin's discovery rule extend the statute of limitations for the Sawyers' claim for negligent infliction of emotional distress sustained as a result of a meeting that took place in 1985?

¶ 6. (4) Does the doctrine of laches bar claims that the defendants engaged in negligent therapy and psychiatric care resulting in the implanting of false memories of sexual abuse in a patient where the patient's parents and the adult patient's Estate brought the claims after the patient's death?

## Background

¶ 7. Nancy Anneatra (Anneatra), the woman who is at the center of this lawsuit but is now dead, was born in 1958 to Delores and Thomas Sawyer. From the record we discover that from quite a young age, Anneatra suffered a variety of psychiatric problems, including anxiety, panic attacks, and severe depression, and that on at least one occasion prior to meeting either of the defendants in this action, she required psychiatric hospitalization.

¶ 8. As this case comes before us on the motion for summary judgment and prior to the completion of discovery, it is unclear at this time when Anneatra began having memories of being sexually abused by her father, whether she always had such memories, or whether her first memories were repressed and brought forward only a short time before she met Lausted. What is clear is that Anneatra first met Lausted at a women's shelter in Eau Claire, Wisconsin, in late 1983. As evidenced by a diary entry in the autumn of 1983, when she met Lausted, Anneatra had already had some memory of being sexually abused by her father, the plaintiff Thomas Sawyer. And although the record does not disclose when Anneatra began to

receive mental health treatment regarding her memories of sexual abuse, the parties agree that prior to receiving such treatment from Lausted in June 1984, she had been receiving mental health treatment from others, including Dr. Kathryn Bemmann, who is not a defendant in this case.

¶ 9. In June 1984, Lausted, who at the time was an unlicensed therapist, began to treat Anneatra. In July 1985, the Sawyers first learned that Anneatra believed that she had been sexually abused by her father when, together with Dr. Bemmann and Lausted, Anneatra confronted her parents in Dr. Bemmann's office. It was at this meeting that Anneatra accused both of physically abusing her during her childhood, and accused her father of sexually abusing her. The Sawyers deny that any abuse occurred.

¶ 10. Shortly after this confrontation, Anneatra discontinued all contacts with her parents and changed her name from Sawyer to Anneatra to make it more difficult for her parents to find her. Anneatra maintained a post office box through which her parents could, and did on occasion, reach her, but apparently neither Anneatra nor the Sawyers contacted the other directly during the next ten years. Anneatra's sister served as a conduit through which the Sawyers from time to time would obtain information about Anneatra.

¶ 11. In 1988, Anneatra filed a lawsuit in Minnesota against her parents seeking civil damages for harm caused by their abuse. Her complaint included allegations that as a result of the sexual abuse she suffered at the hands of her father, she had to undergo an abortion at age 13 and that her mother had arranged for the abortion. The complaint also indicated that Anneatra had repressed her memory of the abuse until October 1983, when she became aware of the

abuse as a result of counseling and treatment. It appears that neither party to this lawsuit is certain how far the Minnesota lawsuit progressed, although they agree that it was dismissed before serious efforts toward discovery were made.

¶ 12. Anneatra continued to receive therapy from Lausted throughout her life. After Dr. Bemmann terminated her treatment of Anneatra in 1987, Lausted referred Anneatra to the defendant, Midelfort, a psychiatrist, who participated in Anneatra's care through December of 1994. Midelfort treated Anneatra more than 50 times during this period, administering and monitoring Anneatra's medications, providing psychiatric evaluations, and offering Anneatra support for the purpose of maintaining her psychiatric stability. During the course of her treatment with Midelfort, Anneatra told Midelfort that she was sexually abused by her father, paternal grandfather, uncle, brother and two priests. She also told Midelfort that an aunt and cousins were also involved, either as sexual perpetrators themselves or as observers of the sexual perpetration of others.

¶ 13. Anneatra died of cancer in early 1995 and the Sawyers did not learn of her death until perhaps six months thereafter. Following the discovery of her daughter's death, Dolores Sawyer successfully obtained an order appointing herself special administrator of Anneatra's estate. As administrator of the estate, Dolores Sawyer was successful in gaining access to her daughter's medical records.

¶ 14. Subsequently, the instant lawsuit was filed by Delores and Thomas Sawyer in their individual capacities, and Delores Sawyer as special administrator of Anneatra's estate. In their complaint, the Sawyers allege that Anneatra developed false memo-

132

ries of sexual and physical abuse by her father, and physical abuse by her mother, as a result of Lausted's and Midelfort's negligent treatment. They claim that the defendants' negligence caused them "past and future pain, suffering and loss of enjoyment of life."

¶ 15. Specifically, as to their professional negligence claim against Lausted, the Sawyers allege that she failed to properly diagnose and treat Anneatra's problems, misdirected Anneatra's therapy to recover false memories of sexual abuse through the negligent performance of hypnosis and by failing to recognize problems created by such hypnosis, negligently handled the transference and countertransference phenomenon existing in the therapeutic relationship, implanted and reinforced false memories in Anneatra, and failed to recognize that the memories which were being created in Anneatra were false memories.

¶ 16. The Sawyers' allegations against Dr. Midelfort include the same acts of negligence as alleged against Lausted, with the exception of the claim of negligent handling of the transference and countertransference phenomenon, and with the additional allegation that Midelfort failed to properly supervise Lausted's treatment of Anneatra.

¶ 17. In a separate claim, the Sawyers allege that Lausted's negligence caused them emotional distress, their injuries arising from the 1985 meeting at which Anneatra made her accusations.

¶ 18. The Estate's claim alleges that Anneatra sustained personal injuries and seeks damages for "pain, suffering, and disability; medical, psychiatric and psychological expenses; and loss of enjoyment of life" as a result of Lausted's and Midelfort's failure to properly diagnose her psychological problems and their negligent treatment of those problems.

¶ 19. The defendants filed motions for summary judgment, arguing that the plaintiffs' third-party professional negligence actions failed to state claims upon which relief could be granted, and were otherwise barred from bringing their claims due to the doctrine of laches and the statute of limitations. Lausted asserted that the Sawyers' claim of negligent infliction of emotional distress was barred by the statute of limitations and the doctrine of laches. For her part, Midelfort additionally argued that with respect to the claims in which she was named, choice of law principles required that Minnesota law be applied and, additionally, that Minnesota law precluded her from being a defendant. After conducting a hearing, the circuit court issued a lengthy decision granting summary judgment in favor of the defendants on all but the choice of law question and dismissed the plaintiffs' complaint in its entirety.

¶ 20. The circuit court first concluded that the Sawyers' third-party professional negligence claims against Midelfort and Lausted failed to state claims upon which relief could be granted. It considered their claims against both Midelfort and Lausted to be "essentially one[s] of 'interference of filial relationship' which in Wisconsin would be specifically prohibited under *Wells Estate v. Mt. Sinai Medical Center*, 183 Wis. 2d 667, 515 N.W.2d 705 (1994)." Anticipating that its decision would be appealed, the circuit court also addressed the defendants' arguments that the Sawyers' claims were barred by the statute of limitations and found that they were.

¶ 21. The circuit court did not discuss the defendants' doctrine of laches defense. Nor did the circuit court specifically refer to the Sawyers' negligent infliction of emotional distress claim against Lausted, although we read its discussion of the statute of limita-

134

tions on which grounds it dismissed the Sawyers' professional negligence claims as implicitly including their claim of negligent infliction of emotional distress.

¶ 22. The circuit court also dismissed the Estate's claim against Lausted and Midelfort, treating portions of the Estate's allegations separately. The court first concluded that the Estate's claims for damages arising from "loss of enjoyment of life" were claims of loss of consortium which did not survive Anneatra's death. Second, the court concluded that the Estate's remaining allegations of "pain, suffering, and disability; medical and psychological expenses" were purely psychological and dismissed the remainder of the Estate's claim on grounds of public policy, reasoning that allowance of recovery in this case would be too likely to open the way for fraudulent claims and because it believed that allowing recovery would enter a field that has no sensible or just stopping point.

¶ 23. The court of appeals reversed as to each of these rulings and we affirm. We hold that the Sawyers have stated a proper cause of action for professional negligence against both Lausted and Midelfort and that their claims are not barred by the doctrine of laches. Further, the Sawyers' negligent infliction of emotional distress claim is not time barred. Finally, the Estate's claim is neither barred on grounds of public policy nor due to the doctrine of laches.

■

¶ 24. Procedurally, this case is before this court pursuant to the circuit court's grant of summary judgment to the defendants-respondents-petitioners. We independently review a grant of summary judgment applying the same methodology as that used by the circuit court. *Jackson v. Benson,* 218 Wis. 2d 835, 852,

578 N.W.2d 602 (1998). A motion for summary judgment must be granted

> if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

Wis. Stat. § 802.08(2). We explained the process by which we decide motions for summary judgment in *Schuster v. Altenberg*, 144 Wis. 2d 223, 424 N.W.2d 159 (1988), as follows:

> First, we examine the complaint to determine whether a claim for relief has been stated. In determining the legal sufficiency of the complaint, 'the facts pleaded by the plaintiff, and all reasonable inferences therefrom, are accepted as true.' *Prah v. Maretti*, 108 Wis. 2d 223, 229, 321 N.W.2d 182 (1982). The complaint should be found legally insufficient only if ' "it is quite clear that under no circumstances can the plaintiff recover." ' *Id.* [citation omitted] If a claim for relief has been stated, we then turn to the responsive pleadings to determine whether a material factual issue exists. Finally, if no genuine issue of material fact exists, the court may determine that the moving party is entitled to a judgment as a matter of law.

*Id.* at 228.

¶ 25. We first address whether the plaintiffs' third-party professional negligence claims and the Estate's professional negligence claims state claims upon which relief may be granted. In doing so, we accept all the facts pled by the plaintiffs as true.

## *The Sawyers' Professional Negligence Claims*

¶ 26. Whether a third-party professional negligence cause of action against a therapist and psychiatrist[3] to recover damages stemming from injuries caused by a patient's false memories of abuse may be maintained in Wisconsin is a question of law. *See Miller v. Wal-Mart Stores, Inc.*, 219 Wis. 2d 250, 259, 580 N.W.2d 233 (1998). This court reviews questions of law *de novo. Id.*

¶ 27. The defendants make two arguments opposing our recognition of the Sawyers' cause of action. First, they argue that the Sawyers' cause of action has not been recognized under Wisconsin law, and was in fact specifically rejected by this court in *Wells Estate*, 183 Wis. 2d 667. They ask that we preclude the Sawyers' recovery on the grounds articulated therein. Second, the defendants argue that the Sawyers' claim must be rejected on public policy grounds.[4]

---

[3] Throughout the opinion we use the terms "therapist," "psychiatrist," and "psychotherapist" interchangeably.

[4] The defendants do not argue that the plaintiffs have failed to properly plead a negligence cause of action. A properly pled negligence action requires the existence of (1) a duty of care on the part of the defendant; (2) a breach of that duty; (3) a causal connection between the conduct and the injury; and (4) an actual loss or damage as a result of the injury. *Miller v. Wal-Mart, Inc.*, 219 Wis. 2d 250, 260, 580 N.W.2d 233 (1998)(citing *Rockweit v. Senacal*, 197 Wis. 2d 409, 418, 541 N.W.2d 742 (1995)).

The defendants make no attempt to cast doubt upon the existence of any of the elements of the plaintiffs' cause of action, nor the plaintiffs' ability to prove each element. We understand that for the purpose of their motion for summary judgment, the

¶ 28. As to their argument that *Wells Estate* is controlling authority under which we must reject the Sawyers' third-party professional negligence claim, we find that the defendants are in error. While both in *Wells Estate* and here the claim at issue involves third-party professional negligence, the claims are distinguishable. In *Wells Estate*, we held that Wisconsin law would not recognize a mother's professional malpractice claim against her adult daughter's physicians seeking damages for the mother's "loss of society and companionship" when her daughter died following treatment. *Wells Estate*, 183 Wis. 2d at 679. In contrast, the Sawyers have not alleged that their injuries are due to "loss of society and companionship," but rather are due to "past and future pain, suffering and loss of enjoyment of life." While the circuit court and the defendants characterize the Sawyers' allegations as the equivalent of a claim seeking compensation due to the "loss of society and companionship,"[5] the difference between the nature of the injury alleged in *Wells Estate* and the nature of the injury alleged by the Sawyers is more than semantic.

¶ 29. A claim for the loss of society and companionship seeks damages for a tortfeasor's interference with a personal relationship. The "plaintiff's recovery in such cases is predicated upon the emotional ties he or she shares with the injured party." *Id.* at 675. In contrast, the Sawyers' claim does not allege that the defendants' negligence interfered with their relationship with their daughter, nor is their recovery predicated upon the emotional ties they shared with

defendants do not dispute that all of the elements of a properly pled negligence action have been met.

[5] Or the "interference with filial relationships" as the circuit court described the Sawyers' claim.

their daughter. Instead, the Sawyers' recovery is predicated upon the direct injury they themselves suffered as a result of the defendants' negligence which was responsible for their daughter's accusations that they were abusive. The harm arising from the loss of a daughters' companionship is different than the harm that arises from accusations of sexual assault.

¶ 30. We have previously noted that those accused of sexual assault feel the pain and stigma associated with the accusations. *See Doe v. Archdiocese of Milwaukee*, 211 Wis. 2d 312, 355, 565 N.W.2d 94 (1997). However, the pain and suffering and loss of enjoyment of life arising from a false accusation are injuries not predicated upon an accused's personal relationship with his or her accuser. As will become clear from the public policy discussion which follows, the difference between the injury claimed in *Wells Estate* and the injury claimed here is substantial, and the public policy concerns upon which we precluded the imposition of liability in *Wells Estate* are not present in this case. We find that *Wells Estate* does not control.

¶ 31. While we rejected the third-party professional negligence claim in *Wells Estate*, rejection of third-party professional negligence claims under other circumstances is not foreordained. Indeed, this court has recognized the legitimacy of third-party professional negligence claims in certain circumstances. *See, e.g., A. E. Investment Corp. v. Link Builders, Inc.*, 62 Wis. 2d 479, 214 N.W.2d 764 (1974) (recognizing that architects may be held liable to a lessee harmed by the negligent construction of a building); *Auric v. Continental Cas. Co.*, 111 Wis. 2d 507, 331 N.W.2d 325 (1983) (recognizing that an attorney may be held liable to the beneficiaries of a will harmed by negligent drafting of the will on the behalf of a testator); *Citizens State*

*Bank v. Timm, Schmidt & Co.*, 113 Wis. 2d 376, 335 N.W.2d 361 (1983) (recognizing that an accountant may be held liable to a lender harmed by reliance on an audit report negligently prepared for borrower). Of most import, in a case closest to the facts we face here, we held that a psychiatrist may be held liable to third parties for failure to warn a patient of a medication's side effects. *Schuster*, 144 Wis. 2d 223.

¶ 32. Relying upon *Schuster*, the plaintiffs argue we should recognize their cause of action as merely the application of a new set of facts to established law. Although we recognized three separate third-party causes of action in *Schuster*, the one most closely on point to the issue we face here involved the question of whether a psychiatrist could be held liable to third parties for injuries the third parties sustained as a result of the psychiatrist's negligent diagnosis and treatment of a patient. *Id.* at 229. The plaintiff in *Schuster* was injured in an automobile accident while her mother, who was medicated, was driving. The daughter alleged that her mother's psychotherapist did not warn her mother of the side effects of her medication. We held that "a psychotherapist may be held liable in negligence for failure to warn of the side effects of a medication if the side effects were such that a patient should have been cautioned against driving, because it was foreseeable that an accident could result, causing harm to the patient or third parties if the patient drove while using the medication." *Id.* at 232–33.

¶ 33. The defendants argue that *Schuster* is not controlling on the question before this court because it may be distinguished from the case before us on the facts. First, *Schuster* involved physical injury, not the non-physical injuries alleged by the plaintiffs in this

action. Second, the "diagnosis and treatment" that was in issue in *Schuster*, and which the defendants characterize as properly prescribing medication, was not as complex as is the diagnosis and treatment of mental health patients.

¶ 34. We observe that the facts involved in *Schuster* differ from those here. However, whether these factual differences merit rejection of the Sawyers' cause of action turns on whether considerations of public policy should preclude the imposition of liability under the facts of this case. The parties agree and have provided detailed public policy analyses of the question we face.

██

¶ 35. We have explained that "[t]he fundamental principle of Wisconsin negligence law. . .[is] that a tortfeasor is fully liable for all foreseeable consequences of his act except as those consequences are limited by policy factors." *Citizens State Bank*, 113 Wis. 2d at 386. Our decisions have established that when a negligence action is properly pled, and all of the elements of the cause of action met, liability may be limited as a matter of law where considerations of public policy require dismissal of the claim and relieve the defendant of liability in a particular case. *See Bowen v. Lumbermens Mut. Cas. Co.*, 183 Wis. 2d 627, 654, 517 N.W.2d 432 (1994); *Peters v. Menard*, 224 Wis. 2d 174, 193, 589 N.W.2d 395 (1999). The denial of liability upon public policy grounds is best determined following a trial and a full consideration of the facts. *Bowen*, 183 Wis. 2d at 654. However, where the facts presented are simple and the question of public policy is fully presented by the complaint and the motion for summary judgment, this court may make the public policy determination. *See id.* at 654–55. This is such a case.

141

¶ 36. In deciding whether public policy precludes imposing liability on the defendants, we consider whether:

(1) the injury is too remote from the negligence; or

(2) the injury is too wholly out of proportion to the culpability of the negligent tort-feasor; or

(3) in retrospect it appears too highly extraordinary that the negligence should have brought about the harm; or

(4) allowance of recovery would place too unreasonable a burden on the negligent tort-feasor; or

(5) allowance of recovery would be too likely to open the way for fraudulent claims; or

(6) allowance of recovery would enter a field that has no sensible or just stopping point. *Garret [v. City of New Berlin]*, 122 Wis. 2d [223], 233–34, [362 N.W.2d 137 (1985)].

*Schuster*, 144 Wis. 2d at 242–43. In addition to these public policy considerations, the defendants express deep concern that our recognition of the Sawyers' cause of action will seriously damage the therapist-patient relationship; we address these collateral burdens identified by the defendants as well.

¶ 37. Our first consideration is whether the Sawyers' injuries are too remote from the defendants' negligence. We believe that they are not: the Sawyers' injuries stem directly from their daughter's accusations that they abused her, and the accusations stem from the defendants' negligent treatment that implanted or reinforced in Anneatra her false memories of sexual abuse. The Sawyers' injuries stand apart from the defendants' negligence the same degree the

142

plaintiff's injury stood apart from the defendant's negligence in *Schuster*. *See Schuster*, 144 Wis. 2d 223 (plaintiff was injured by the patient of the defendant psychotherapist). The proximity of the injury to the negligence in *Schuster* did not preclude our imposition of liability there, and it should not here. In third-party causes of action, a plaintiff's injury will be separated from a defendant's negligence to at least the degree involved here, and this public policy consideration does not preclude liability in those circumstances. Privity is not required *per se* to maintain a negligence action in Wisconsin. *See id.* Furthermore, the defendants have not contended that the Sawyers' injuries were remote from their negligence.

¶ 38. We also do not believe that the alleged injuries are too wholly out of proportion to the culpability of the negligent tortfeasor, and the defendants appear to be in agreement as to this point as well. This court has tied culpability in negligence jurisprudence to foreseeability. *Beacon Bowl v. Wis. Elec. Power Co.*, 176 Wis. 2d 740, 762, 501 N.W.2d 788 (1993). In their brief, the defendants conceded that "damage to a person accused of abusive behavior is certainly foreseeable," an understanding with which we are in full agreement. Even those jurisdictions which have declined to impose liability under facts similar to those here have acknowledged that "the harm to a parent accused of sexual abuse is foreseeable." *See, e.g., Bird v. W.C.W.*, 868 S.W.2d 767, 768 (Tex. 1994).

¶ 39. We have previously observed the great harm that accompanies an accusation of sexual abuse of a child. *See Doe*, 211 Wis. 2d at 355 n.31. (" 'Society's justifiable repugnance toward (sexual abuse of a child). . .is the reason why a falsely accused [person] can be gravely harmed.' " (citation omitted)). Others

have observed that "[i]t is indisputable that 'being labeled a child abuser (is) one of the most loathsome labels in society' and most often results in grave physical, emotional, professional, and personal ramifications." *Hungerford v. Jones*, 722 A.2d 478, 480 (N.H. 1998)(citation omitted). We are quite confident that negligent treatment which encourages false accusations of sexual abuse is highly culpable for the resulting injury.

¶ 40. As for our consideration of the third public policy, we do not find the Sawyers' injuries to be too highly extraordinary that the defendants' alleged negligence should have brought about the harm. The harms the Sawyers have alleged are the ordinary and predictable injuries one might expect following negligent therapy which implants and reinforces false memories of sexual abuse at the hands of family members which results in accusations of that abuse.

¶ 41. We next consider whether allowance of recovery would place too unreasonable a burden on the negligent tortfeasor. The defendants argue that allowing the parents of an adult child a claim for third-party professional negligence would unreasonably burden the tortfeasor with multiple suits premised upon a single negligent act. They rely upon *Wells Estate* for support that this public policy consideration should act to preclude imposing liability under the facts here. However, our consideration of this public policy does not lead us to the result reached in *Wells Estate*, for as noted in our discussion above, the defendants misconceive the nature of the Sawyers' allegations, allegations which we do not believe give rise to excessive liability.

¶ 42. When in *Wells Estate* we concluded that Wisconsin law did not recognize a parent's claim for the

144

loss of an adult child's society and companionship, we recognized that to allow recovery for such a claim would impose excessive liability upon the tortfeasor because "the possible universe of claimants is limited only by the number of persons with whom the injured person has established personal relationships." *Wells Estate*, 183 Wis. 2d at 675. Under Wisconsin law, a negligent tortfeasor may be liable to the victim for the injuries sustained, and to the victim's spouse and minor children for loss of society and companionship. *Id.* at 677–78. We concluded that sound public policy dictates that a limit be placed upon the liability facing negligent tortfeasors, *id.* at 677, tying this conclusion to our concern that the death of any one person would leave unknown numbers of individuals with potential claims for loss of society and companionship.

¶ 43. However, as we have noted, in contrast to *Wells Estate*, the Sawyers are not claiming loss of society and companionship or damages that resulted from their estrangement from their daughter. The Sawyers' claim is related to the harm that arose directly as a result of Anneatra's accusations. Importantly, unlike the claim involved in *Wells Estate*, the Sawyers' claim may be brought only by those who have been wrongfully accused of sexually abusing their accuser, not by the unknown numbers of individuals whose relationship with the patient is negatively affected by the negligent therapy. Under the Sawyers' theory of the case, therapists may be held liable only to those who are wrongly accused by a patient of sexually abusing that patient. Therefore, the defendants fear of excessive liability is misplaced.

¶ 44. Fifth, we consider whether allowing the Sawyers to recover would be too likely to open the way to fraudulent claims. The defendants contend that the

145

potential for fraudulent claims involves the possibility that an individual will claim that his or her relationship with a patient was negatively affected by the patient's therapy and as a result was emotionally harmed. Fraud, the defendants claim, will be manifest in claims brought by those who did not in fact share a substantial relationship with their patient. However, as we noted above, the Sawyers' claim is not tied to personal relationships, but rather to accusations of abuse. Defendants need not be concerned with the difficult task of rebutting evidence of a plaintiff's close personal relationship with a patient who was treated negligently, because this cause of action is not premised upon the relationship, but rather the accusation. Further, we doubt that there is a significant possibility of fraud when a claim is based upon accusations of abuse, particularly in light of the extraordinary stigma our society places upon those accused of sexually abusing a child. We find that it is too unlikely that a claim premised upon being falsely accused of sexual abuse will be brought by someone who has not, in fact, been so accused.

¶ 45. Finally, we disagree that allowing the Sawyers in this case to bring an action will enter a field that has no sensible or just stopping point. The defendants express concern that by imposing liability in this case this court will open the door to claims of emotional harm and damaged personal relationships from all manner of individuals who believe that their relationships with a patient have been negatively affected by the patient's therapy. However, as we have discussed above, the Sawyers' claims differ from those claims alleging interference with personal relationships. The Sawyers' claims are not related to their estrangement from Anneatra. Their claims are appropriately limited

146

to those who are harmed by the accusations of sexual abuse arising from false and reinforced memories arising from negligent therapies. So limited, the claim has a sensible and just stopping point.

¶ 46. None of these public policies lead us to the conclusion that liability should be limited in this case. However, we also consider the collateral burden our recognition of the Sawyers' claim may have on the therapist-patient relationship. The defendants have identified two primary manifestations of the burden.

¶ 47. First, the defendants argue that a therapist who is held liable to third parties for their emotional health will push therapists to either cease treating patients who believe they may have been sexually abused, or refrain from using new and untested forms of therapy which they believe are best suited for treating their patients. The defendants believe that in either event a patient's well-being will be substantially harmed.

¶ 48. Those courts which have concluded that claims similar to the Sawyers should be rejected have done so by recognizing these concerns. In *Flanders v. Cooper*, 706 A.2d 589 (Maine 1998), for instance, the Maine Supreme Court concluded that public policy precluded imposing upon a health care professional a duty of care to injured third parties because such a duty would intrude directly on the professional-patient relationship. *Id.* at 591. The court observed that by placing such duty of due care to third parties upon therapists, "[a] health care professional who suspected that a patient had been the victim of sexual abuse and who wanted to explore that possibility in treatment would have to consider the potential exposure to legal action by a third party who committed the abuse." *Id.* This,

147

the court concluded, would improperly restrict the treatment choices of the health care professional. *Id.*

¶ 49. The Supreme Court of Illinois, in *Doe v. McKay*, 700 N.E.2d 1018 (1998), reached a similar conclusion, expressing the concern raised in *Flanders* that third-party liability would intrude too closely on the therapist-patient relationship. "Hoping to avoid liability to third parties" the court wrote, "a therapist might instead find it necessary to deviate from the treatment the therapist would normally provide, to the patient's ultimate detriment. This would exact an intolerably high price from the patient-therapist relationship and would be destructive of that relationship." *Id.* at 1024.

¶ 50. We are not unsympathetic to the therapist-patient relationship. However, we are not convinced that therapists will be limited in their treatment choices by virtue of being subject to third-party professional negligence claims. We agree with the reasoning of the Supreme Court of New Hampshire in *Hungerford*, 722 A.2d 478, which wrote that the defendants' public policy concerns with restricting a therapist's choice of treatments, and discouraging therapists to treat those who believe they may have been sexually abused in the past out of fear of liability, "overlooks the fact that the standard of care by which a therapist's conduct is measured is not heightened [by a third-party cause of action]." *Id.* at 481–82. The cause of action "imposes 'no more than what a therapist is already bound to provide—a competent and carefully considered professional judgement.' " *Id.* at 482 (citing *Althaus by Althaus v. Cohen*, 710 A.2d 1147, 1157 (Pa. Super. Ct. 1998); *see* [Montoya by Montoya v.] *Bebensee*, 761 P.2d [285], 288–89 [(Colo. Ct. App. 1988)]).

¶ 51. In Wisconsin,

a medical practitioner, 'be he a general practitioner or a specialist, should be subject to liability in an action for negligence if he fails to exercise that degree of care and skill which is exercised by the average practitioner in the class to which he belongs, acting in the same or similar circumstances.' *Shier v. Freedman*, 58 Wis. 2d 269, 283–84, 206 N.W.2d 166, 208 N.W.2d 328 (1973).

*Schuster*, 144 Wis. 2d at 229. We have further explained that we could "conceive of no reason why a psychiatrist, as a specialist in the practice of medicine, should not be compelled, as are all other practitioners, to meet the accepted standard of care established by other practitioners in the same class." *Id.* at 230. The Sawyers' third-party action will not burden the therapist with a standard of care more onerous than that under which he or she is already required to act in treating his or her patients. Therefore, the therapist's treatment choices need be limited only by the duty of care the therapist owes his or her patient.

¶ 52. The defendants insist that the treatment of sexual abuse is so much more complex than is prescribing medication that our conclusion in *Schuster* is not applicable here. We disagree as to this point as well. Our holding in *Schuster* with respect to the standard of care to which a psychiatrist would be held was not dependent upon the complexity of the therapy or treatment involved. Furthermore, complexity of therapy or treatment necessarily is a factor that informs what is found to be the standard of due care in a particular case. Presumably, the more complex the health problem a therapist is faced with, the more latitude a therapist will have in treatment choices. However, we do not believe that a therapist should be relieved from

149

liability when his or her treatment is negligent simply because the problem he or she is treating is complex.

¶ 53. As to this burden, we conclude that "the therapist is in the best position to avoid harm to the accused parent and is solely responsible for the treatment procedure." *Hungerford*, 722 A.2d at 482. "[A]n accused parent should have the right to reasonably expect that a determination of sexual abuse, 'touching him or her as profoundly as it will, will be carefully made.'" *Id.* at 482 (citing *S. v. Child & Adolescent Treatment*, 614 N.Y.S.2d at 666).[6]

¶ 54. The second manifestation of the burden the defendants believe weighs against recognizing the Sawyers' cause of action involves the importance of confidentiality in the therapist-patient relationship. The defendants believe that recognition of the Sawyers' claim will unduly burden the therapist and his or her patient because such claims place confidentiality between the patient and the therapist at substantial risk. Because the patient holds the privilege of confidentiality, the defendants in third-party actions may not be able to successfully defend themselves, for they will not be able to breach their duty of confidentiality to their patients.

¶ 55. The problem identified by the defendants is not present in this case. Due to Anneatra's death, the plaintiffs have access to her medical records. Perhaps problems of confidentiality would preclude liability from being imposed in a future case, but here it does not.

---

[6] We do not agree with the *Hungerford v. Jones*, 722 A.2d 478, 480 (N.H. 1998), court that the third-party action may be recognized only where the accusation of sexual abuse has been made public.

¶ 56. In sum, we find that none of the public policy considerations identified by the defendants should preclude the imposition of liability in this case.

### The Estate's Cause of Action

¶ 57. The Estate alleges that due to the defendants' negligent treatment, Anneatra experienced "pain, suffering and disability; medical, psychiatric and psychological expenses; loss of enjoyment of life." In holding that the Estate does allege a claim upon which relief can be granted, we recognize the well-settled rule that courts liberally construe allegations presented in a complaint and accept them as true for purposes of determining whether a claim is stated. *See Hermann v. Town of Delavan*, 215 Wis. 2d 370, 378, 572 N.W.2d 855 (1998). We read the Estate's claim as a valid survival action seeking compensatory damages stemming from professional negligence.

¶ 58. Whether the Estate has stated a cause of action which survives Anneatra's death is governed by Wis. Stat. § 895.01(1), Wisconsin's survival statute, as well as considerations of public policy. The defendants divide the Estate's claim into two separate causes of action. They argue first that the allegations concerning Anneatra's "loss of enjoyment of life" is precluded as personal to Anneatra and therefore not surviving under our interpretation of the scope of Wis. Stat. § 895.01(1). Second, the defendants maintain that the Estate's allegations concerning "pain, suffering and disability; medical, psychiatric and psychological expenses," while not precluded by Wis. Stat. § 895.01(1) or our interpretation of the statute, should be barred by considerations of public policy.

151

¶ 59. Wisconsin Stat. § 895.01(1) governs survival claims and provides in relevant part, that

> [i]n addition to the causes of action that survive at common law, the following shall also survive: causes of action. . .for. . .other damage to the person.
> . . .

*Id.* The parties are in agreement that should the Estate have properly stated a survival claim, it must be read as one alleging "other damage to the person."

¶ 60. While we have written that Wis. Stat. § 895.01(1) does not limit the nature of the damages that may be recovered under a survival action, *Wangen v. Ford Motor Co.*, 97 Wis. 2d 260, 310, 294 N.W.2d 437 (1980), we have held that not all actions survive one's death. *See Howard v. Lunaburg*, 192 Wis. 507, 511, 213 N.W. 301 (1927). Specifically, we held that "[d]amage to feelings, or loss of consortium" did not constitute a property right nor damages to the person within the meaning of the survival statute. *Id.* Subsequently, in *Hanson v. Valdivia*, 51 Wis. 2d 466, 187 N.W.2d 151 (1971), we held that an action for the alienation of affection did not survive to the Estate.

¶ 61. Here, the defendants argue that the Estate's claim alleging loss of enjoyment of life is the equivalent of a claim for the termination of Anneatra's relationship with her parents, and must be rejected in accord with our holding in *Hanson*. However, *Hanson* does not control, for a claim seeking damages for the loss of enjoyment of life resulting from professional negligence is not analogous to an action for the alienation of affection. Loss of enjoyment of life includes those damages that result from one's "diminished capacity for enjoying life" or due to the "deprivations of the pleasures of life." *See Bassett v. Milwaukee N. R. Co.*,

169 Wis. 152, 159, 170 N.W.2d 944 (1919). These are not the equivalent to damages to feelings or loss of consortium upon which we precluded a claim for alienation of affection in *Hanson*. Instead, the alleged damages are those that flow from professional negligence just as pain and suffering and costs associated with medical treatment flow. They include but are not limited to damages associated with a plaintiff's inability to engage in the activities of life he or she had been able to prior to the defendant's negligence, and they are not damages predicated upon a relationship with another person.

¶ 62. The defendants also assert that the Estate's claim, alleging only psychological damages, must be dismissed on the public policy grounds that allowing the Estate's claim would open the way for fraudulent claims; they rely upon our decision in *Bowen* for this conclusion. However, the claim asserted by the Estate is not analogous to the claim brought in *Bowen*, nor does consideration of the public policy which precluded imposing liability there lead to the same conclusion here.

¶ 63. The estate's claim in *Bowen* was one for the negligent infliction of emotional distress which related to the "apprehension and fear [the decedent] suffered before his death." *Bowen*, 183 Wis. 2d at 661. The decedent in *Bowen* was killed when he was hit by a vehicle and fatally injured while riding his bicycle. *Id.* at 634. This court rejected the Estate's claim for the decedent's emotional distress which was allegedly endured in the few moments immediately preceding his death. We concluded that

It is mere speculation to assert that [the decedent] knew of the impending impact or suffered severe

emotional distress in the moments before impact. Allowance of recovery under the circumstances of this case would be too likely to open the way to fraudulent claims.

*Id.* at 662.

¶ 64. The facts of this case are inapposite. The most compelling difference between the Estate's claim here and the claim in *Bowen* is the length of time between the negligent act to the moment of death. While in *Bowen*, mere moments between the two acts passed and we rightly believed that one could not determine the amount of distress, if any, the victim could have experienced, here, Anneatra's injuries are not necessarily speculative. At the motion on the hearing for summary judgment, the circuit court elicited from plaintiffs' counsel the manner in which they intended to prove Anneatra's injuries, namely through examination of witnesses who had opportunity to talk with Anneatra in the many years she was being treated by the defendants, as well as evidence of her injuries in diary entries. Further, the emotional injuries Anneatra suffered may be determined with a view to her medical records. The concerns we expressed in *Bowen* are not present in this case to the extent that we must conclude that the Estate's claim should not be allowed to proceed. The professional negligence claim survives to Anneatra's Estate.

### *Statute of Limitations*

¶ 65. Defendants additionally argue that the Sawyers' claim for negligent infliction of emotional dis-

tress against Lausted is barred by Wis. Stat. § 893.54,[7] the three-year statute of limitations governing injury to the person.[8] The Sawyers' claim for negligent infliction of emotional distress arises out of damages they allegedly suffered in 1985 when Anneatra confronted her parents and accused both of physically abusing her, and accused her father of sexually abusing her. As noted in our earlier discussion, in addition to Anneatra and the Sawyers, Lausted and Dr. Bemmann were also present during the confrontation. Having filed their claim in 1996, unless the workings of the discovery rule adopted by this court in *Hansen v. A.H. Robins, Inc.*, 113 Wis. 2d 550, 560, 335 N.W.2d 578 (1983), extends the deadline by which the Sawyers were required to file, their claim is indeed barred.

¶ 66. With application of the discovery rule as adopted by this court in *Hansen*, tort claims accrue on the "date the injury is discovered or with reasonable diligence should be discovered, whichever occurs first." *Id.* at 560. We subsequently explained that with application of the discovery rule, "a cause of action will not accrue until the plaintiff discovers, or in the exercise of reasonable diligence should have discovered, not only

---

[7] Wis. Stat. § 893.54(1) provides in relevant part that an action to recover damages for injuries to the person must be commenced within 3 years or be barred.

[8] On appeal the defendants do not argue that the Sawyers' professional negligence claims against Midelfort and Lausted are barred by the workings of the statute of limitations. In the court of appeals, the defendant Lausted argued that the Sawyers' professional negligence claim and their claim of negligent infliction of emotional distress were barred by the statute of limitations. Here, though, the defendants' statute of limitations argument is limited to the Sawyers' negligent infliction of emotional distress against Lausted.

the fact of the injury but also that the injury was probably caused by the defendant's conduct or product," *Borello v. U.S. Oil Co.*, 130 Wis. 2d 397, 411, 388 N.W.2d 140, 46 (1986), and later, that the discovery rule should be extended to allow a tort action to accrue only after the identity of the defendant is known, or reasonably should have been known. *Spitler v. Dean*, 148 Wis. 2d 630, 631–32, 436 N.W.2d 308 (1989). Until the time that a plaintiff discovers, or with reasonable diligence should have discovered, that he or she has suffered actual damage due to the wrongs committed by a particular, identified person, they are not capable of enforcing their claims, either because they do not know that they have been wronged or because they do not know the identity of the person who has wronged them. *Pritzlaff v. Archdiocese of Milwaukee*, 194 Wis. 2d 302, 315–16, 533 N.W.2d 780 (1995).

¶ 67. The parties do not dispute that the Sawyers' negligent infliction of emotional distress injuries occurred in 1985 when the Sawyers' daughter made her accusations. However, the parties do dispute when the Sawyers should have known that they were wronged and when they should have known the identity of the person who wronged them.

¶ 68. Plaintiffs are obligated to exercise reasonable diligence in discovering the identity of the defendant. *See Spitler*, 148 Wis. 2d at 638. Reasonable diligence must also be exercised in discovering that the defendant caused their injuries. "Reasonable diligence" means that a plaintiff must be as diligent "as the great majority of persons would use in the same or similar circumstances." *Id.* (citing *Hilker v. Western Automobile Ins. Co.*, 204 Wis. 1, 15, 231 N.W. 257, 235 N.W. 413 (1931)(opinion on reconsideration)). "Plaintiffs may not close their eyes to means of information rea-

sonably accessible to them and must in good faith apply their attention to those particulars which may be inferred to be within their reach." *Id.* (citing *Kanack v. Kremski*, 96 Wis. 2d 426, 432, 291 N.W.2d 864 (1980)). The question of whether plaintiffs exercised reasonable diligence is ordinarily one of fact, to be determined by the fact-finder. *Id.*

¶ 69. Lausted maintains that since the Sawyers claim that the abuse never occurred, reasonable people in their position, upon being confronted with allegations as reprehensible as these were, would have investigated the cause of those allegations. On the basis of this premise, Lausted argues that the Sawyers should have known her identity, and that she was the cause of their injuries, no later than 1988.

¶ 70. As support for this legal conclusion, Lausted first points out that she was in the room with the Sawyers when their daughter Anneatra accused them of abuse. Should that not have been sufficient to put the Sawyers on notice that she caused their injuries through therapy, Lausted argues that certainly upon receiving Anneatra's lawsuit in 1988, wherein Anneatra claimed that she was informed of her abuse through treatment and counseling, the Sawyers were on notice that Anneatra's counselor may have been at fault.

¶ 71. In response, the Sawyers argue that they were in fact unaware of the role Lausted played in Anneatra's treatment when confronted with the allegations in 1985. They additionally claim that Lausted's role remained unknown when Anneatra filed suit in 1988: the lawsuit did not name Anneatra's therapists. Perhaps most important, the Sawyers' claim that they did not know that the therapy was the cause of Anneatra's false memories. They state that they did not know

157

that Lausted was using repressed memory therapy until Dolores was appointed administrator of Anneatra's estate and she was successful in gaining access to her daughter's medical records.

¶ 72. With the facts of record, we cannot state that as a matter of law the Sawyers failed to exercise reasonable diligence in discovering the cause of their injury. While the Sawyers knew that they were injured, it is possible as they suggest that they did not know until following Anneatra's death that their injury was caused by Lausted or by Lausted's conduct. As the court of appeals noted in its decision, the Sawyers have suggested a number of possible causes of their injuries apart from Lausted's negligence, including: "psychiatric illness, Anneatra's involvement in survivor groups, ill will or spite, or the reading of popular literature on childhood sexual abuse." *Sawyer*, 217 Wis. 2d at 816 n.9. Should any one of these alternate, and plausible, reasons for Anneatra's accusations be responsible for their injuries, the Sawyers would not have been wronged and therefore would not have had a claim against anyone. It was only upon discovering that Lausted was using repressed memory therapy that they determined that their injury was the result of the negligent act of another. Whether a reasonable person in the Sawyers' position would have done more to discover that their injuries could be attributed to Lausted's negligence is a factual question best left to the fact-finder. Summary judgment should not have been granted on this issue.

### Doctrine of Laches

¶ 73. Finally, the defendants assert that the doctrine of laches entitles them to summary judgment on

both the Sawyers' and the Estate's professional negligence claims. We conclude that as the first element of laches has not been established as a matter of law, summary judgment on this ground was improper.[9]

██

¶ 74. Laches is an equitable defense to an action based on the plaintiff's unreasonable delay in bringing suit under circumstances in which such delay is prejudicial to the defendant. *See Schafer v. Wegner*, 78 Wis. 2d 127, 132, 254 N.W.2d 193, 196 (1977). The successful assertion of laches requires that the defense prove that 1) the plaintiff unreasonably delayed in bringing the claim, 2) the defense lacked any knowledge that the plaintiff would assert the right on which the suit is based, and 3) the defense is prejudiced by the delay. *Schneider Fuel v. West Allis State Bank*, 70 Wis. 2d 1041, 1053, 236 N.W.2d 266 (1975). If any single element is missing, laches will not be applied and the claims allowed to proceed. Where the facts are undisputed and there is only one reasonable inference, the court may conclude as a matter of law that the elements are met. *See Schafer*, 78 Wis. 2d at 132, 254 N.W.2d at 196 (concluding that prejudice was established in that case as a matter of law). If the material facts or reasonable inferences are disputed, however, summary judgment will be improper.

¶ 75. Under the facts of the record before us, we cannot conclude that the defense of laches has been

---

[9] As we conclude that the defendants have not met each of the elements required of a laches defense, we need not address the plaintiff-appellant's additional argument that the doctrine of laches is an equitable defense that may not be pled in claims of law. *See State v. Castillo*, 213 Wis. 2d 488, 492, 570 N.W.2d 44 (1997) (an appellate court should decide cases on the narrowest possible grounds).

established. Under the first prong of the laches defense, defendants must show that the plaintiffs unreasonably delayed in bringing this lawsuit. Just as we concluded that whether the Sawyers should have known that Lausted's negligent therapy was the cause of their injuries was one to be resolved by the fact-finder, it logically follows from that conclusion that a question of fact also exists as to whether the Sawyers unreasonably delayed in bringing the professional negligence claims against Midelfort and Lausted, for it is not possible to determine whether the Sawyers delayed in bringing these claims unless it is first determined when their lawsuit against each defendant accrued. And as is true of the Sawyers' negligent infliction of emotional distress claim, so to is it not possible on summary judgment to determine when their professional negligence claim accrued.

¶ 76. We agree with the court of appeals' conclusion that

> If it is true, as the Sawyers claim, that they had no reason to believe Lausted's and Midelfort's negligent treatment caused Anneatra to make her allegations, and if it is also true that they made several unsuccessful attempts to discern what caused the allegations, their delay in bringing the action until they obtained Anneatra's medical records would not appear to be unreasonable.

*Sawyer*, 217 Wis. 2d at 806.

¶ 77. Whether the Estate unreasonably delayed in bringing suit is a question requiring a different focus. The defendants suggest that all of the facts with regard to Anneatra's treatment were in her possession for years before the Estate brought its suit; therefore, when considering this survival action we must con-

160

clude that because Anneatra had knowledge of the elements of her claim, by implication her Estate must be held to have had the knowledge. We disagree.

¶ 78. The central component of the Estate's claim is its belief that Anneatra did not know that she was being treated negligently. While the doctrine of laches is a defense apart from the statute of limitations, we believe that the discovery rule of the latter defense provides helpful analysis for the application of the former defense. Under the discovery rule, a cause of action does not accrue until the plaintiff knows that he or she has been injured. The Estate's claim is premised upon Anneatra's lack of knowledge that she was being treated negligently. Therefore, the Estate's cause of action did not accrue until it discovered her injury when it gained access to her treatment records. The Estate did not unreasonably delay in bringing its claim.

### *Conclusion*

¶ 79. We conclude that the circuit court should not have entered summary judgment on the Sawyers' and the Estate's claims. Both the Sawyers and the Estate have stated claims upon which relief may be granted. None of the claims should have been dismissed on grounds of the statute of limitations or by the workings of the doctrine of laches.

*By the Court.*—The decision of the court of appeals is affirmed.

¶ 80. CHIEF JUSTICE SHIRLEY S. ABRAHAMSON did not participate.

¶ 81. JON P. WILCOX, J. (*concurring*). It is with a bit of reluctance that I join the majority in its decision today. Without question, this is not an easy case—the allegations by Nancy K. Anneatra, true or false, are disturbing and regrettable. Nevertheless, I agree with the majority that there are genuine issues of material fact at issue in this case. I write separately to reiterate the narrow scope of the majority's decision based upon the unique facts of this case.

¶ 82. As I understand the majority's interpretation of the plaintiffs' third-party professional negligence claims, it is limited to "the harm that arose directly as a result of Anneatra's accusations." Majority at 145. It does not include loss of society or companionship, or their estrangement from Anneatra. Majority at 138–39, 146–47. The majority has similarly limited the Estate's claim to "damages associated with the plaintiff's inability to engage in the activities of life he or she had been able to prior to the defendant's negligence, and they are not damages predicated upon a relationship with another person," as well as damages for pain and suffering and expenses. Majority at 151–53. The majority's public policy arguments are premised on the limited nature of these claims and are now the law of the case. *Univest Corp. v. General Split Corp.*, 148 Wis. 2d 29, 38–39, 435 N.W.2d 234 (1989).

¶ 83. Despite the limited nature of the majority's holding, I am still concerned that by allowing this suit to go forward others will soon follow. From a public policy standpoint, such actions may place an unreasonable burden on therapists' treatment choices and on confidentiality between therapists and patients.

¶ 84. The majority dismisses the defendants' public policy concerns relating to the restriction of a therapist's choice of treatments. I however believe that

the concerns expressed by the Illinois Supreme Court are well-founded.

> Approval of the plaintiff's cause of action, however, would mean that therapists generally, as well as other types of counselors, could be subject to suit by any nonpatient third party who is adversely affected by personal decisions perceived to be made by a patient in response to counseling. This result would, we believe, place therapists in a difficult position, requiring them to answer to competing demands and to divide their loyalty between sharply different interests. Concern about how a course of treatment might affect third parties could easily influence the way in which therapists treat their patients. Under a rule imposing a duty of care to third parties, therapists would feel compelled to consider the possible effects of treatment choices on third parties and would have an incentive to compromise their treatment because of the threatened liability. This would be fundamentally inconsistent with the therapist's obligation to the patient. . .to the patient's ultimate detriment.

*Doe v. McKay*, 700 N.E.2d 1018, 1023–24 (Ill. 1998). The mere threat of a lawsuit may ultimately hinder beneficial treatment by therapists and/or counselors.

¶ 85. The majority also dismisses the doctors' concerns about confidentiality between a therapist and patient due to Anneatra's death. However, in the next case, the defendant(s) may be presented with a different situation, one in which the therapist cannot properly defend himself or herself without revealing confidences disclosed in sessions. All communications between a patient and his or her therapist are privileged and are subject to limited disclosure. Wis. Stat. § 905.04(2), (3) and (4)(c) (except when patient's physi-

cal, mental or emotional condition is raised as an element of a patient's claim or defense).

¶ 86. As the United States Supreme Court has recognized, effective therapy "depends upon an atmosphere of confidence and trust" in which the patient is willing to completely disclose facts, emotions, memories and fears, generally of a very sensitive nature. *Jaffee v. Redmond*, 518 U.S. 1, 10 (1996)(extending therapist privilege to social workers). Disclosure of such sessions may cause embarrassment or disgrace, and "the mere possibility of disclosure may impede development of the confidential relationship necessary for successful treatment." *Id.*

¶ 87. By allowing third-party actions against therapists, patients may be faced with a difficult choice between preserving the confidentiality of patient-therapist communications or assisting the therapist in responding to the action. "The [physician-patient] privilege serves the public interest by facilitating the provision of appropriate treatment for individuals suffering the effects of a mental or emotional problem. The mental health of our citizenry, no less than its physical health, is a public good of transcendent importance." *Id.* at 11. Because of the strong public interest in effective treatment, and in maintaining confidentiality between the therapist-patient, I believe we must be cautious in imposing a broad duty of care toward third parties.

¶ 88. For the foregoing reasons, I concur.

¶ 89. ANN WALSH BRADLEY, J. (*dissenting*). For the reasons set forth in the concurrence, I respectfully dissent. The concurrence and I part company when it portrays the majority opinion as narrowly writ-

ten. Concurrence at 162. I read the majority opinion as a significant change of the law under the guise that it is unique to the facts of this case.

¶ 90. In arriving at its conclusion, the majority faces a substantial problem: how to get around *Wells Estate v. Mt. Sinai Medical Center*, 183 Wis. 2d 667, 515 N.W.2d 705 (1994). This court in *Wells Estate* refused to recognize a parent's claim for the loss of an adult child's society and companionship. *Id.* at 675. That is exactly the clam that the Sawyers would like to have argued. Instead, they engaged in creative pleading to circumvent *Wells Estate* and create a new claim recognized by the majority: third-party professional negligence claim, not based on personal relationship, limited to the pain and suffering and loss of enjoyment of life that arises as a result of being falsely accused by a therapist's patient of committing sexual abuse on that patient. Majority op. at 139.

¶ 91. The majority's need to distinguish the prohibition in *Wells Estate* from the present cause of action leads it to remove the limitation that the claim be based on a personal relationship. Under the majority opinion *any* claimant, regardless of the existence or non-existence of relationship, can dress up a loss of society and companionship claim as a claim for pain and suffering through creative pleading and proceed with a valid cause of action.

¶ 92. Since there is no limitation based on personal relationship, under the facts of this case Anneatra's brother, her uncle, her grandfather, her aunt, her cousins, and two priests could also bring a claim. Moreover, since there is no limitation based on personal relationship, under the facts of the next case, a criminal defendant charged with sexually assaulting the patient, an abusive former boyfriend of the patient,

165

or a host of others could also maintain an action against the therapist. Under the majority opinion, all that these individuals would need to claim is that they were inflicted by pain and suffering and loss of enjoyment of life when a patient under the treatment of a therapist falsely accused them of sexual assault.

¶ 93. Although the majority indicates by its holding that this newly recognized cause of action applies only to harm arising out of allegations of sexual abuse, such a limitation is unconvincing. There is no rational basis to distinguish between sexual abuse and physical abuse.

¶ 94. The majority avows to so narrowly tailor the claim that it carves a niche out of the law that is only large enough to include the unique set of facts from the case at hand. Yet, it fails to do so. Instead it crafts a claim that is without limitation to relationship and which cannot be narrowed to just accusations of sexual abuse. As the saying warns, "Once the camel's nose is in the tent the rest is sure to follow." Rather than limiting the scope of the claim, the majority leaves it wide open. Accordingly, I dissent.